881 So.2d 460 (2001)
Ethan Eugene DORSEY
v.
STATE.
CR-97-1522.
Court of Criminal Appeals of Alabama.
May 25, 2001.
Opinion on Return to Remand March 1, 2002.
Rehearing Denied April 19, 2002.
*471 John Gordon Brock, Evergreen; and Robert Christopher King and Jack B. Weaver, Monroeville, for appellant.
William H. Pryor, Jr., atty. gen., and Jeremy W. Armstrong and Beth Jackson Hughes, asst. attys. gen., for appellee.
McMILLAN, Presiding Judge.
The appellant, Ethan Eugene Dorsey, was indicted for three counts of capital murder for murdering Richard Cary, Scott Williams, and Timothy Bryan Crane during the course of a robbery; for murdering two or more people pursuant to one scheme or course of conduct; and for murdering an individual who was less than 14 years of age, violations of § 13A-5-40(a)(2), § 13A-5-40(a)(10), and § 13A-5-50(a)(15), Ala.Code 1975. The jury convicted Dorsey of the lesser offenses of felony murder as to Cary and Williams and the lesser offense of robbery. He was convicted of the capital offense of murdering Crane, a 13-year-old. The jury, by a vote of 11 to 1, recommended that Dorsey be sentenced to life imprisonment in the penitentiary without the possibility of parole. The trial court chose not to follow the jury's recommendation and sentenced Dorsey to death by electrocution. See § 13A-5-47, Ala.Code 1975. The trial court sentenced Dorsey to three consecutive terms of life imprisonment for the two counts of felony murder and the robbery count.
The State's evidence tended to show the following: On November 20, 1996, Brad Cary discovered the bodies of his father Richard Cary, Scott Williams, and Timothy Crane at Cary's Grocery store in Brooklyn, Alabama. All three had been shot. An autopsy revealed that Cary died of a shotgun wound to the left side of his chest; Williams died of a .25 caliber gunshot wound to his head; and Crane died of a .22 or .25 caliber gunshot wound to his head. Approximately $300 and a .357 revolver were missing from the store.
Dorsey's codefendant, Calvin Middleton, testified concerning the events of November 20, 1996. He said that he and Dorsey had planned to rob a grocery store in Brooklyn. Dorsey got two guns, sweaters, and gloves from his house. The two parked a rented Dodge Acclaim automobile near an abandoned house east of the store, put on hoods and gloves, and walked to the store. Dorsey was armed with a revolver and Middleton was carrying a *472 shotgun. The two entered the store with their guns drawn. Cary was behind the counter, Williams was at the end of the counter close to the back, and Crane was leaning on the counter near the front door. Middleton thought that Cary was looking for a gun so he told Cary to walk outside. He then told Cary to get on the ground. Cary tried to grab the gun and Middleton shot him in the chest. Middleton testified that he then ran to the car because he got scared. As he was running, he said, he heard two more shots. Dorsey joined him at the car. Middleton stated that Dorsey told him that he had shot the man and boy because the boy started to run. The two then drove to Yolanda Nelson's house in Boykin. Dorsey and Middleton eventually ended up at a nightclub in Opp, where they saw Rodney Brooks.
Brooks corroborated Middleton's testimony. He said that on November 20, 1996, he was riding around with Dorsey and Middleton when Dorsey said that he and Middleton were going to "hit a store" in Brooklyn. He testified that they stopped at Dorsey's house, Dorsey went into the house, and came out carrying a small caliber revolver and a duffel bag. He said that Dorsey asked him if he wanted to accompany them to "hit" the store in Brooklyn. Brooks declined and asked that he be dropped off at 8th Avenue in Andalusia. Brooks also testified that he saw the two at a nightclub in Opp later that same night. He said that Middleton told him that he and Dorsey had "pulled some 187s" when they had hit the store in Brooklyn. He said that this was a slang expression, meaning that they had killed some people.
Brad Cary testified that on November 20, 1996, he was with his mother in their home directly across from Cary's store when he heard several gunshots. He thought that his father, Richard Cary, was shooting at animals. Several moments later he went to the store and saw his father's body. Brad Cary testified that he thought that his father, an avid practical joker, was playing a joke on him so he went back to the house, retrieved a gun, and fired a shot into the air. Brad testified that he then realized that his father and the others had been shot and went for help.
While confined in the Escambia County jail, Dorsey told a fellow inmate, Windell Jordan, that Middleton and he had been involved in a robbery that had "gone bad," and that he had shot a boy and that Middleton had shot one of the men with a shotgun.
A search of the area near the store revealed a twenty-dollar bill and a five-dollar bill in the grass near the pavement off County Road6  an area consistent with where Middleton said he and Dorsey had parked the car. Two days after the murders a .357 revolver was found about 150 yards from the scene of the robbery-murders in the grass near County Road 6.
Dorsey's defense was that he did not commit the robbery-murders. He attempted to place the blame on Brad Cary.

Standard of Review
As with every case involving the death penalty, this Court must review the record for any plain error, i.e., for any defect in the proceedings whether or not it was brought to the attention of the trial court. Rule 45A, Ala.R.App.P., defines this Court's responsibility when reviewing a death-penalty case. This section states:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or *473 probably has adversely affected the substantial right of the appellant."
As this Court stated in Hall v. State, 820 So.2d 113, 121-22 (Ala.Crim.App.1999):
"The standard of review in reviewing a claim under the plain-error doctrine is stricter than the standard used in reviewing an issue that was properly raised in the trial court or on appeal. As the United States Supreme Court stated in United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the plain-error doctrine applies only if the error is `particularly egregious' and if it `seriously affects the fairness, integrity or public reputation of judicial proceedings.' See Ex parte Price, 725 So.2d 1063 (Ala.1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999); Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999); Johnson v. State, 620 So.2d 679, 701 (Ala.Cr.App.1992), rev'd on other grounds, 620 So.2d 709 (Ala.1993), on remand, 620 So.2d 714 (Ala.Cr.App.), cert. denied, 510 U.S. 905, 114 S.Ct. 285, 126 L.Ed.2d 235 (1993)."
While the failure to object will not preclude this Court from reviewing an issue in this case, it will weigh against any claim of prejudice Dorsey makes on appeal. Dill v. State, 600 So.2d 343 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993).

Guilt-phase Issues

I.
Dorsey argues that the trial court erred in denying several of his discovery motions.
There is no constitutional right to discovery in a criminal case. Rule 16, Ala.R.Crim.P., provides a defendant a limited right to discovery. In Ex parte Monk, 557 So.2d 832 (Ala.), on remand, 557 So.2d 832 (Ala.1989), the Alabama Supreme Court upheld a trial court's discovery order that directed the State to maintain an "open file" policy because the accused was charged with a capital offense. Since Monk was released this Court has recognized that a defendant charged with a capital offense has the need for "broadened" discovery. See Wilson v. State, 777 So.2d 856 (Ala.Crim.App.1999), aff'd, 777 So.2d 935 (Ala.2000), cert. denied, 531 U.S. 1097, 121 S.Ct. 826, 148 L.Ed.2d 709 (2001); Sneed v. State, 783 So.2d 841 (Ala.Crim.App.1999); Hardy v. State, 804 So.2d 247 (Ala.Crim.App.1999); Pace v. State, 714 So.2d 320 (Ala.Crim.App.1996).
When reviewing a claim that a trial court erred in denying a discovery motion, we must determine whether the trial court abused its discretion. See Minor v. State, 780 So.2d 707 (Ala.Crim.App.1999).

A.
Dorsey argues that the trial court erred in denying his motion to depose the State's expert witnesses.
As this Court stated in Wilson v. State, supra:
"Rule 16, Ala.R.Crim.P., does not specifically provide that every criminal defendant is entitled to depose the State's expert witnesses. In this case, the appellant has not shown that deposing the State's expert witnesses was critical to his defense. During the discovery process, he received documentary evidence from which he could prepare to impeach the credibility, training, and expertise of, as well as the conclusions reached by, the State's expert witnesses. Furthermore, the experts did not testify about highly technical or `arcane' subject matter *474 as the appellant alleges. Therefore, the appellant has not shown that the trial court abused its discretion in denying his request. See Maples v. State, 758 So.2d 1 (Ala.Cr.App.1999)."
777 So.2d at 926.
Here, Dorsey filed a pretrial motion seeking to depose the State's expert witnesses and to depose individuals who were incarcerated. At a pretrial hearing the State informed the court that Dorsey had already had access to the witnesses and had been furnished with the information pertinent to their testimony and that Dorsey also had been given the opportunity to take the witnesses' statements. The trial court denied the motion, stating that Dorsey failed to show any "compelling or extraordinary circumstances." Dorsey makes only a general assertion in his brief on appeal that he was prejudiced by the trial court's failure to grant this motion, because the experts testified about "arcane" subject matter such as "the operation of metal detectors, polygraph equipment, ballistics, forensic pathology," and because he needed to be able to attack the credibility of the inmate witnesses.
There is absolutely no evidence in the record that Dorsey was denied access to any information introduced by the State. The trial court noted that the State was obliged to maintain an open file policy, except with regard to privileged information. Also, the record reflects that Dorsey thoroughly cross-examined these witnesses. The trial court did not abuse its discretion in denying Dorsey's motion to depose these witnesses. See Minor v. State, supra.

B.
Dorsey argues that the trial court erred in denying his request for his institutional records that he asserts were critical to his defense. The following occurred at the motion hearing on this issue:
"The Court: Motion for Discovery of Institutional Records and Files  let's see of whom. Has  to your recollection, has your client been incarcerated in the past?
"[Defense counsel]: No, sir.
"The Court: Has he had any mental health records that you know of?
"[Defense counsel]: No, sir, not as far as I'm aware of. Judge, I will say this, I'm not aware of any of these records that any of these places that they're going to have any records except the jails. Mr. Dorsey was incarcerated on this charge at the Covington County jail for a short time and then in the Conecuh County jail and now the Escambia County Detention Facility. However, in an abundance of caution, you know, I am going to request that these people tell me if they got something. I'll give you an example, this is not the case in this case, but, if my client had some type of severe mental disease or defect, he might not be able to tell me whether he's in one of these places.
"[Prosecutor]: Judge, I'm going to object to the State being required to do a fishing expedition on that. If the defendant knows that and has some offer of proof, then, we'll be glad to comply.
"The Court: I'm going to deny the motion. That's actually available from the defendant and from his family members."
Dorsey argues that the trial court's failure to allow him access to his institutional records denied him the opportunity to present mitigating evidence. However, Dorsey makes no argument as to what the records might have contained. Indeed, Dorsey chose not to put on any mitigating evidence at the penalty phase. The trial court, in an effort to determine whether *475 Dorsey had voluntarily waived his right, had an extensive colloquy with Dorsey about what he was giving up by not presenting any mitigating evidence. Also, the jury, by a vote of 11-1, recommended that Dorsey be sentenced to life imprisonment without the possibility of parole. Dorsey failed, both at trial and on appeal, to show why this information was necessary to his defense. Dorsey has failed to establish how he was prejudiced by the court's failure to grant this motion. Rule 45A, Ala.R.App.P.
Dorsey also argues that it was error to fail to allow him access to the institutional records of Windell Jordan, an inmate incarcerated with Dorsey, who testified that Dorsey confessed to him that Middleton and he were responsible for the Brooklyn murders. Dorsey had no right to Jordan's prior conviction records, much less his institutional records. As we stated in Hardy v. State, supra:
"We have held in Alabama in a number of cases that a defendant is not entitled to the general disclosure of the criminal records of the state's witnesses. See, e.g., Davis v. State, 554 So.2d 1094 (Ala.Crim.App.1984), aff'd, 554 So.2d 1111 (Ala.1989), cert. denied, 498 U.S. 1127, 111 S.Ct. 1091, 112 L.Ed.2d 1196 (1991); Wright v. State, 424 So.2d 684 (Ala.Crim.App.1982) (no absolute right of disclosure of criminal records of state's witnesses); Mardis v. State, 423 So.2d 331 (Ala.Crim.App.1982); Mack v. State, 375 So.2d 476 (Ala.Crim.App.1978), aff'd, 375 So.2d 504 (Ala.1979), vacated on other grounds, 448 U.S. 903, 100 S.Ct. 3044, 65 L.Ed.2d 1134 (1980). We have also held that the trial court's refusal to order the prosecution, pursuant to a defendant's discovery motion, to provide the criminal record of each expected witness for the state was not a violation of Brady [v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)] and its progeny. Davis v. State, 554 So.2d at 1100."
804 So.2d at 286. See also Maples v. State, supra.
After Jordan testified for the State, defense counsel moved to exclude his testimony. He asserted that during discovery he had been given a copy of a Nation Crime Information Center ("NCIC") report for Jordan that had showed that Jordan had two prior felony convictions. However, during Jordan's testimony he admitted to having four prior felony convictions.[1]
Here, the defense obtained more information than it was entitled to under our current law; i.e., it got the NCIC report for Jordan. Also, Dorsey can show no prejudice because, Jordan admitted under oath to having four prior felony convictions.

C.
Dorsey also argues that it was error for the trial court to deny his motion to inspect in camera allegedly privileged information that had not been disclosed to the defense.
The only portion of the record that discusses privileged information is contained in a pretrial motion hearing:
"[Defense counsel]: Judge, if you would, if they are asserting privilege on an item  I am not sure they have done that at this point but if they do, if the Court would order that they produce it to the Court in camera for review and it can be reviewed later if it ever comes up instead of it being an issue after trial.

*476 "The Court: No, I'm not going to do that. If there is something that comes up later on I guess we'll deal with it if it's appropriate to deal with it.
"[Defense counsel]: Would the Court at least order that they notify that they are asserting privilege toward any matters?
"The Court: That's all right, I think."
The above portion of the record shows that the trial court did not deny this motion. The court indicated that it would deal with this matter when it was presented. There is no further discussion of any alleged privileged information in the record. There is no evidence that information was not disclosed because that information was privileged. The record fails to support Dorsey's assertion.

D.
Dorsey also argues that the trial court erred in not allowing him to visit the crime scene.
Dorsey filed a pretrial motion requesting that he be allowed to visit the crime scene. The prosecutor strenuously objected because, he said, the victim's family still lived there and they were going through a very emotional time. The prosecution did not object to the defense attorneys or their investigators visiting the crime scene. Based on this response, the trial court refused to allow Dorsey to visit the crime scene but said that if his attorneys had a problem viewing the scene they could come to him for help. There is no further discussion of this motion in the record. We note, that pursuant to the discovery order Dorsey had access to photographs and a videotape of the crime scene.
As this Court stated in Minor v. State, 780 So.2d 707, 727 (Ala.Crim.App.1999):
"Minor did not at trial, and does not on appeal, offer any compelling reasons why his presence at the crime scene was necessary nor did he offer any specific explanation as to how his defense was prejudiced by his not being allowed to view the scene. Therefore, we conclude no error resulted in the trial court's denial of Minors' motion to view the scene of the crime with his attorneys. Mason v. State, 768 So.2d 981 (Ala.Cr.App.1998)."
There is no evidence in the record that the trial court abused its discretion in denying this motion.

II.
Dorsey argues that the trial court erred in failing to control the pretrial publicity concerning the case. Specifically, he argues that the trial court erred in failing to order that all motion hearings be closed to the press, that transcripts be sealed until a jury was selected, and that the court failed to prohibit cameras from the courtroom.
At the hearing on this motion, the trial court indicated that it did not want to close the courtroom but that it was willing to order all parties not to discuss the case with any news media.[2] The trial judge also told his court reporter to notify him if anyone requested a transcript of the proceedings. The court further noted that if anyone inquired about a transcript it would hold a hearing at that time. Finally, the trial court indicated that it would control the use of cameras in the courtroom. The jury was also sequestered. There is no further discussion of this motion in the record. There is absolutely no indication that the trial court abused its discretion in handling this motion. See Minor. In fact, it appears that Dorsey got the relief he requested. Dorsey's claim is not supported by the record.

*477 III.
Dorsey argues that the trial court erred in failing to dismiss the indictment because, he says, it was multiplicitous and duplicitous. The indictment against Dorsey contained three counts and read as follows:
"Count I
"The Grand Jury of said County charge that before the finding of this indictment that Ethan Eugene Dorsey whose name is otherwise unknown to the Grand Jury did intentionally cause the death of Richard Cary by shooting him with a shotgun, did intentionally cause the death of Scott Williams by shooting him with a pistol, and did intentionally cause the death of Timothy Bryan Crane by shooting him with a pistol and Ethan Eugene Dorsey caused said deaths during the time that Ethan Eugene Dorsey was in the course of committing a theft of U.S. currency, the property of Richard Cary, by the use of force against the person of Richard Cary with intent to overcome his physical resistance or physical power of resistance while the said Ethan Eugene Dorsey was armed with a deadly weapon, to-wit: a pistol, in violation of section 13A-5-40(a)(2) of the Code of Alabama and against the peace and dignity of the State of Alabama.
"Count II
"The Grand Jury of said County charge that before the finding of this indictment that Ethan Eugene Dorsey whose name is otherwise unknown to the Grand Jury did intentionally cause the death of two or more persons, to-wit: Richard Cary, Scott Williams, and Timothy Bryan Crane, by one act or pursuant to one scheme or course of conduct, in violation of Section 13A-5-40(10) [sic] of the Code of Alabama and against the peace and dignity of the State of Alabama.[[3]]
"Count III
"The Grand Jury of said County charge that before the finding of this indictment that Ethan Eugene Dorsey whose name is otherwise unknown to the Grand Jury did intentionally cause the death of Timothy Bryan Crane who is less than fourteen years of age, in violation of Section 13A-5-40(15) [sic] of the Code of Alabama and against the peace and dignity of the State of Alabama." [[4]]

A.
An indictment is multiplicitous if a single offense is charged in more than one count. See Borden v. State, 711 So.2d *478 498 (Ala.Crim.App.1997), aff'd, 711 So.2d 506 (Ala.), cert. denied, 525 U.S. 845, 119 S.Ct. 113, 142 L.Ed.2d 91 (1998). The indictments here were not multiplicitous. As we stated in Williams v. State, 710 So.2d 1276, 1321 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998):
"In regard to the double jeopardy argument, one indictment charged the appellant with the intentional killing of four persons  Gerald Paravicini, Freddie Barber, Linda Barber, and Bryan Barber, a violation of § 13A-5-40(a)(10); and the other capital indictment charged him with the murder of Linda Barber and Freddie Barber during the course of a robbery in the first degree, a violation of § 13A-5-40(a)(2). Both indictments are based partly on the same act: the intentional killing of Linda and Freddie Barber. However, the test in determining whether the charges run afoul of the Double Jeopardy Clause is whether each crime contains a statutory element not contained in the other. Blockburger v. United States, 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932); see also United States v. Dixon, 509 U.S. 688, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993) (a plurality of the United States Supreme Court reaffirmed the Blockburger test as the sole criterion for judging double jeopardy claims); Seritt v. State, 647 So.2d 1 (Ala.Cr.App.), cert. denied, 647 So.2d 1 (Ala.1994). In this case, each capital offense charged required proof of an element that the other did not. Proof of the murder-robbery charge required proof of a robbery in the first degree, which the multiple murder charge did not require. Proof of the multiple murder charge required proof of more than one murder, which the capital murder offense of murder of two or more persons did not require. We therefore conclude that under the Blockburger test, the appellant was properly indicted and convicted for two separate and distinct capital offenses `notwithstanding a substantial overlap in the proof offered to establish the crimes,' Iannelli v. United States, 420 U.S. 770, 785 n. 17, 95 S.Ct. 1284, 1293 n. 17, 43 L.Ed.2d 616 (1975); Jackson v. State, 516 So.2d 726, 761 (Ala.Cr.App.1985), rem'd on other grounds, 516 So.2d 768 (Ala.1986). Therefore, the charges were not multiplicitous and the appellant's convictions for both offenses did not violate the Double Jeopardy Clause."

B.
An indictment is duplicitous if two or more separate offenses are joined in a single count of an indictment. Dill v. State, 723 So.2d 787 (Ala.Crim.App.1998), and Capps v. State, 587 So.2d 442 (Ala.Crim.App.1991).
Count I of the indictment was duplicitous. It charged three different and distinct capital offenses in one count of the indictment. Dorsey should have been indicted for three different counts of robbery-murder because there were three victims. However, this defect in the indictment did not render the indictment void. The indictment did not fail to state an offense. It tracked the language of § 13A-5-40(a)(2).
Rule 13.5(c)(2), Ala.R.Crim.P., states: "No charge shall be deemed invalid, nor shall the trial, judgment, or other proceedings thereon be stayed, arrested, or in any manner affected, for any defect or imperfection in the charge which does not tend to prejudice the substantial rights of the defendant upon the merits."
This same issue was presented in Dobyne v. State, 672 So.2d 1319 (Ala.Crim.App.), after remand, 672 So.2d 1353 (Ala. *479 Crim.App. 1994), aff'd, 672 So.2d 1354 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996). In Dobyne we stated:
"Rule 13.3 states: `Two or more offenses shall not be joined in the same count.' It was a violation of this rule to join both capital murders, § 13A-5-40(a)(2), in the same count of the indictment. However, this error was error without injury to the appellant. The appellant could lawfully have been indicted for two counts of capital murder, the murder of Billingsley during a robbery and the murder of Snipes during a robbery. The appellant faced conviction for two counts of capital murder. He has not suffered any prejudice."
Id. at 1325. (Footnote omitted.)
Dorsey could have lawfully been indicted for five different counts of capital murder. Three counts of murder during the course of a robbery for the murder of Cary, Williams, and Crane; one count of the murder of two or more people pursuant to one scheme or course of conduct; and one count of the murder of an individual less than 14 years of age. It is clear from the pretrial hearing and the dialogue between defense counsel and the court that Dorsey was aware that he was being charged with three capital offenses under Count I of the indictment. Dorsey was put on notice that the three separate victims in Count I of the indictment constituted three separate capital offenses. The trial court also instructed the jury that three separate acts were alleged to have occurred under Count I of the indictment.
Moreover, Dorsey was convicted of only two counts of felony murder, robbery, and one count of capital murder under Count III of the indictment. Although Count I of the indictment was duplicitous, it did not prejudice Dorsey nor invalidate his convictions. See Rule 13.3, Ala.R.Crim.P. and Dobyne v. State, supra.

IV.
Dorsey argues that the trial court erred in denying his motion for a change of venue because, he argues, there was extensive pretrial publicity surrounding the case. During the motion hearing on this issue, defense counsel presented numerous newspaper articles and videotapes of news reports that discussed the facts and circumstances surrounding the murders. After defense counsel introduced all of his evidence in support of the motion, the court stated:
"The Court: I'll take that under advisement. I think we're going to have to listen to answers the jurors give on voir dire to make that determination. We'll do it as we have in the past, after we hear what the jury's members say on voir dire.
"[Defense counsel]: Are you going to delay  just delay ruling until then, Judge, so we don't have to refile another motion?
"The Court: Yes."
During voir dire many jurors indicated that they had heard or had read about the case. These jurors were questioned individually about their ability to render an impartial verdict based on their prior knowledge of the case. After voir dire the following occurred:
"[Defense counsel]: Judge, before  and you may not want to do this until in the morning, but, there is a pending motion... for change of venue which we raise at this time based on the fact that the Court's seen the publicity and every juror except about four said they had seen it and heard about it.
"The Court: Notably, not one juror indicated that they would be affected by it.

*480 "[Defense counsel]: Actually, I think one did.
"The Court: Really?
"[Prosecutor]: But, I think he got off?
"[Defense counsel]: Yeah. He's been struck. I think you struck him for cause.
"The Court: Either for that or for something else.
"[Defense counsel]: I think it was a combination of factors."
The next morning, after giving both parties a chance to argue the motion  which neither party did  the trial court denied the motion.
This Court in Taylor v. State, 808 So.2d 1148, 1203-04 (Ala.Crim.App.2000), aff'd, 808 So.2d 1215 (Ala.2001), stated:
"Media publicity can prejudice prospective jurors and thereby result in a denial of a defendant's right to an impartial jury. Chandler v. Florida, 449 U.S. 560, 101 S.Ct. 802, 66 L.Ed.2d 740 (1981). In order to get a change of venue based on pretrial publicity, the defendant must prove that there existed actual prejudice against the defendant as a result of the publicity or that the community was saturated with prejudicial publicity. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Newspaper articles or widespread publicity, without more, is insufficient to grant a motion for a change of venue. Anderson v. State, 362 So.2d 1296, 1298 (Ala.Cr.App.1978).
"Our review of the voir dire examination concerning pretrial publicity indicates that, while many veniremembers had heard something about the case from the media, there were no grounds to warrant a change of venue. See Stewart v. State, 730 So.2d 1203, 1241 (Ala.Cr.App.1996)."
Also, in Williams v. State, 565 So.2d 1233, 1237-38 (Ala.Crim.App.1990), we stated:
"`As the Supreme Court explained in Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961):
"`"To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court...."
"`The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2035-2036, 44 L.Ed.2d 589 (1975). Thus, "[t]he proper manner for ascertaining whether adverse publicity may have biased the prospective jurors is through the voir dire examination." Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App.1978).'
"Ex parte Grayson, 479 So.2d 76, 80 (Ala.1985), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 [(1985)]."
We have reviewed the voir dire examination and find no evidence that the trial court erred in denying Dorsey's motion for a change of venue.

V.
Dorsey also argues in his brief to this Court that the trial court erred in "preventing Mr. Dorsey from discovering possible biases among potential jurors and blocked efforts to ensure that the venire and the jury were impartial." He cites several different grounds in support of this contention.

*481 A.
Dorsey initially argues that the trial court erred in not allowing him to individually voir dire the prospective jurors.
"In Alabama, there is no requirement that a defendant be allowed to question each prospective juror individually during voir dire examination. This rule applies to capital cases, and the granting of a request for individual voir dire is discretionary with the trial court. Browning v. State, 549 So.2d 548 (Ala.Cr.App.1989); Bui v. State, 551 So.2d 1094 (Ala.Cr.App.1988), aff'd, 551 So.2d 1125 (Ala.1989), vacated, [499] U.S. 971, 111 S.Ct. 1613, 113 L.Ed.2d 712 (1991). In the instant case, the trial court required the parties to submit proposed voir dire questions, and it decided which questions it would ask; however, the court did allow individual voir dire questioning of all veniremembers in reference to their views concerning the imposition of the death penalty. The record reflects a thorough and comprehensive voir dire examination of the prospective jurors. We conclude that the trial court did not abuse its discretion in its handling of the voir dire examination, and thus find no error."
Coral v. State, 628 So.2d 954, 968 (Ala.Crim.App.), on remand, 628 So.2d 988 (Ala.Crim.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994).
Here, the trial court allowed the prospective jurors to be questioned in groups of 12. As did the court in Coral, the trial court required the parties to submit proposed questions and then decided which ones it would ask the jurors. Dorsey was given the right to individually voir dire certain jurors who indicated potential biases during the questioning.
"In selecting a jury for a particular case, `the nature, variety, and extent of the questions that should be asked prospective jurors' must be left largely within the sound discretion of the trial court. Peoples v. State, 375 So.2d 561 (Ala.Crim.App.1979). In other words, the scope of the voir dire examination of the jury venire is within the broad discretion of the trial court."
Bracewell v. State, 447 So.2d 815, 821 (Ala.Crim.App.1983), aff'd, 447 So.2d 827 (Ala.), cert. denied, 469 U.S. 980, 105 S.Ct. 382, 83 L.Ed.2d 318 (1984). There is no indication in the record that the trial court abused its discretion.
Dorsey also argues that the trial court severely restricted his voir dire by making him submit written questions. The identical procedure was used and approved in Coral v. State, supra.
Dorsey further asserts that the trial court erred in asking leading questions during voir dire examination. As stated above, the method of voir dire examination is within the discretion of the trial court. See Bracewell v. State, supra.

B.
Dorsey argues that the trial court improperly removed a prospective juror for cause.
The record indicates that prospective juror G.S. was struck for cause. There was no objection to the trial court striking this juror for cause; thus, we review this issue for plain error. Rule 45A, Ala.R.App.P.
The following occurred during voir dire examination:
"The Court: And, [G.S.] could you go through that weighing process?
"[G.S.]: I have a family member in the system and I don't really want to have nothing to do with it.

*482 "The Court: You have a family what now?
"[G.S.]: I have a family [member] in the system and I really wouldn't want to have anything, you know, to do with it....
"The Court: All right. Who is your family member who is in the system?
"[G.S.]: J. and M.
"The Court: Okay. Are these the same  is [J.S.] the same [J.S.] who was convicted of capital murder in this Court some years back, [G.S.]? Note for the record the juror nodded yes. Are you saying that you could not be a juror in this case?
"[G.S.]: No, sir.
"The Court: And when you said no, sir you meant that you could not be a fair and impartial juror?
"[G.S.]: No, sir."
Dorsey argues that the above remarks reflect that this prospective juror could try the case impartially. However, our reading of the above exchange supports the State's position that this juror indicated that he was biased and did not want to serve on the case because he had a family member who had been convicted of capital murder. Also, when the State moved that this juror be struck for cause defense counsel made no objection. This further supports our interpretation of the above dialogue. Defense counsel was there facing the prospective juror  we are not. Certainly, if counsel did not believe that this juror should have been struck for cause based on his answers during voir dire he would have objected to his removal. Based on the record before this Court, we find no plain error.
Dorsey also argues, in a footnote in his brief, that the trial court erred in sua sponte excusing several jurors before general voir dire because of schedule conflicts, as well as health and family problems.
Defense counsel did not object to the trial court's excusing any jurors outside the presence of Dorsey and his attorneys; thus, we review this issue for plain error. Rule 45A, Ala.R.App.P.
Section 12-16-74, Ala.Code 1975, specifically gives a trial court the right to excuse potential jurors outside the presence of the parties and their counsel. No error, much less plain error, occurred here.

C.
Dorsey argues that the trial court erred in failing to remove several potential jurors for cause when they indicated, during voir dire, that they believed that Dorsey had the burden of proving his innocence. Dorsey does concede that each of these jurors, when questioned further, indicated that he or she could follow the law as instructed by the court. Dorsey appears to argue that the trial court's rehabilitation of these jurors was not sufficient to eradicate the bias.
We have recognized that a juror may be rehabilitated when the juror indicates a bias. See Hall v. State, 820 So.2d 113 (Ala.Crim.App.1999); Williams v. State, 571 So.2d 338 (Ala.1990), cert. denied, 500 U.S. 938, 111 S.Ct. 2067, 114 L.Ed.2d 471 (1991). Dorsey has cited this Court to no reason to depart from this long-standing rule.
Dorsey also argues that the trial court erred in failing to remove for cause a juror who indicated that she worked in the clerk's office in Conecuh County. He asserts that she was privy to documents concerning the case and that she should have been removed for cause for that reason. However, there is absolutely no proof of this assertion in the record. Moreover, the reason advanced here is not *483 a statutory ground for a strike for cause under § 12-16-150, Ala.Code 1975. Because this is not a statutory basis for removing a juror, the reason must be one that indicates probable prejudice or so fixed an opinion that the juror could not try the case impartially. See Burton v. State, 651 So.2d 641 (Ala.Crim.App.1993). This juror indicated that she could be fair and impartial. Also, Dorsey never moved that this juror be struck for cause, which indicates that this juror did not voice any bias. Rule 45A, Ala.R.App.P. We find no plain error here.

D.
Dorsey argues that the trial court erred in excluding jurors who, he argues, expressed mere reservations about imposing the death penalty. Dorsey lists nine jurors he contends were erroneously excluded. Dorsey fails to make a specific argument in his brief concerning each prospective juror; he makes only a general argument. While we do not condone such a presentation of this issue, we will review the argument because this is a death-penalty case.
Initially, we observe that no objections were made when the challenged jurors were removed for cause. Therefore, we look only for plain error. Rule 45A, Ala.R.App.P.
We have reviewed the portions of the record Dorsey cites in his brief. Eight jurors were removed because they stated unequivocally that they could not vote to impose the death penalty. Another juror was removed after she indicated that she was opposed to the death penalty on religious grounds and could not vote for the death penalty. These jurors did more than express mere reservations about the death penalty.
"The `original constitutional yardstick' on this issue was described in Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Under Witherspoon, before a juror could be removed for cause based on the juror's views on the death penalty, the juror had to make it unmistakably clear that he or she would automatically vote against the death penalty and that his or her feelings on that issue would therefore prevent the juror from making an impartial decision on guilt. However, this is no longer the test. In Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), the United States Supreme Court held that the proper standard for determining whether a veniremember should be excluded for cause because of opposition to the death penalty is whether the veniremembers's views would '"prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."' The Supreme Court has expressly stated that juror bias does not have to be proven with `unmistakable clarity.' Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)."
Pressley v. State, 770 So.2d 115, 127 (Ala.Crim.App.1999), aff'd, 770 So.2d 143 (Ala.), cert. denied, 531 U.S. 931, 121 S.Ct. 313, 148 L.Ed.2d 251 (2000).
The record shows that these jurors expressed views that would affect their impartiality as a juror. The trial court did not err in granting the strikes for cause.

E.
Dorsey next argues that the trial court erred in denying his motion requesting that the State disclose favorable information about the prospective jurors. At the motion hearing, the trial court stated the following:
"I tell you what I'll do, I'll grant this motion to the extent that if the State is *484 aware that a juror has answered falsely to a question proposed  propounded during voir dire that they inform the defendant of their knowledge of the defendant's [sic] false response to voir dire. To go further, I think, would invite real problems in the case because you would always be able to view some sort of evidence as potentially mitigating or potentially not mitigating."
As we stated in McGriff v. State, [Ms. CR-97-0179, September 29, 2000] ___ So.2d ___, ___ (Ala.Crim.App.2000):
"The State has no duty to disclose information concerning prospective jurors. As we stated in Arthur v. State, 711 So.2d 1031 (Ala.Crim.App.1996), aff'd, 711 So.2d 1097 (Ala.1997), quoting Kelley v. State, 602 So.2d 473 (Ala.Crim.App.1992):
"`"This court has held that arrest and conviction records of potential jurors do not qualify as the type of discoverable evidence that falls within the scope of Brady and that a trial court will not be held in error for denying an appellant's motion to discover such documents. Slinker v. State, 344 So.2d 1264 (Ala.Cr.App.1977). Cf., Clifton v. State, 545 So.2d 173 (Ala.Cr.App.1988) (The nondisclosed evidence was not exculpatory, thus Brady was inapplicable). In other words, the appellant does not have an absolute right to the disclosure of the arrest and conviction records of prospective jurors. See Slinker, supra. Cf., Davis v. State, 554 So.2d 1094 (Ala.Cr.App.1984), aff'd, 554 So.2d 1111 (Ala.1989), rehearing overruled, 569 So.2d 738 (Ala.1990), cert. denied, 498 U.S. 1127, 111 S.Ct. 1091, 112 L.Ed.2d 1196 (1991) (defendant is not entitled to the general disclosure of the criminal records of the state's witnesses); Wright v. State, 424 So.2d 684 (Ala.Cr.App.1983) (no absolute right to disclosure of criminal records of state's witnesses).
"`"Several jurisdictions have similarly held. See, e.g., People v. Murtishaw, 29 Cal.3d 733, 175 Cal.Rptr. 738, 631 P.2d 446 (1981), cert. denied, 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 464 (1982) (trial judge has discretionary authority to permit defense access to jury records); Moon v. State, 258 Ga. 748, 375 S.E.2d 442 (1988), cert. denied, 499 U.S. 982, 111 S.Ct. 1638, 113 L.Ed.2d 733 (1991) (trial court did not err in denying defendant's motion for pretrial discovery of state's juror information records); State v. Wiggins, 556 So.2d 622 (La.App.1990)(defendant is not necessarily entitled to `rap sheets' of prospective jurors); State v. Weiland, 540 So.2d 1288 (La.App.1989)(defendant is not entitled to rap sheets of prospective jurors because those records are useful to state in its desire to challenge jurors with inclinations or biases against state, but are not pertinent to purpose of defendant's voir dire: to challenge jurors who defendant believes will not approach the verdict in a detached and objective manner); State v. Childs, 299 S.C. 471, 385 S.E.2d 839 (1989)(no right to discovery of criminal records of potential jurors absent statute or court rules requiring such disclosure); Jeffrey F. Ghent, Anot., Right of Defense in Criminal Prosecution to Disclosure of Prosecution Information Regarding Prospective Jurors, 86 A.L.R.3d 571, § 4(a) (1978), and the cases cited therein.
"`"Also, the state has no duty to disclose information that is available to the appellant from another source. Hurst v. State, 469 So.2d 720 (Ala.Cr.App.1985). Here, the appellant could *485 have procured this information from the veniremembers themselves during voir dire. See also Clifton, supra (nondisclosure did not prejudice appellant's defense)."'
"711 So.2d at 1080."

F.
Dorsey argues that the trial court prevented him from ensuring that his grand and petit jury venires were representative of the community. Specifically, he argues that the method used to select the jury venires in Conecuh County  a list of county residents holding valid driver's licenses  resulted in the underrepresentation of minority classes and thereby violates Duren v. Missouri, 439 U.S. 357, 99 S.Ct. 664, 58 L.Ed.2d 579 (1979).
Selecting prospective jurors by using such a drivers list has been upheld against challenges that it results in the underrepresentation of minority groups. See Travis v. State, 776 So.2d 819 (Ala.Crim.App.1997), aff'd, 776 So.2d 874 (Ala.2000), cert. denied, 531 U.S. 1081, 121 S.Ct. 785, 148 L.Ed.2d 681 (2001); Acklin v. State, 790 So.2d 975 (Ala.Crim.App.2000); Clemons v. State, 720 So.2d 961 (Ala.Crim.App.1996), aff'd, 720 So.2d 985 (Ala.1998), cert. denied, 525 U.S. 1124, 119 S.Ct. 907, 142 L.Ed.2d 906 (1999); Stanton v. State, 648 So.2d 638 (Ala.Crim.App.1994).

VI.
Dorsey argues that it was error for the trial court to conduct a portion of the voir dire examination while Dorsey was wearing a prison uniform  an orange jumpsuit. He contends that his wearing a prison uniform in front of the prospective jurors destroyed his presumption of innocence and mandates a new trial. We note that the record reflects that Dorsey was not in prison clothes for the entire voir dire process.
Defense counsel moved for a mistrial, arguing:
"[Defense counsel]: Judge, we would make a motion at this time to quash the venire and move for a mistrial on the basis that the defendant has appeared before the venire dressed in jail fatigues, orange fatigues of Escambia County, that he was only transported this morning at nine o'clock and brought directly to the courtroom and on the basis we have not had an opportunity to provide him with civilian clothes due to the late transportation and his family tried to bring him clothes yesterday and Escambia County would not allow them to provide  leave civilian clothes. And, on that basis, we move for a mistrial.
"The Court: All right. Let me note for the record that at nine o'clock the defendant was brought up the stairs to the courtroom outside the presence of jurors, that I had previously made inquiry regarding whether or not he had civilian clothes and expected that he would have civilian clothes on at that time. I had the sheriff then take him to the  an unused witness room for the Juvenile Probation Officer on the second floor of the courthouse and I withheld the opening of Court for 15 minutes to allow his family to bring him clothes and I allowed the attorneys to leave the courtroom and find his family. At about 9:12 the defense attorney, ... came up the stairs with the family members or just with clothing in his hand and took them to  to that unused room. And I allowed enough time for the defendant to change clothes. I don't know what the problem was with the clothes there, but, the defendant then came out of the room still dressed in his Escambia County clothes  jail clothes  and proceeded to go into the Court. I was not asked, at that time, to delay the trial any further. *486 And I had already delayed the beginning of the trial 15 minutes to allow him to get his clothes here and get dressed. And I assume there was some problem with the clothes that were furnished by this family, but, what that was I was never apprised of nor given an opportunity to  to deal with. I never instructed anyone to put the defendant in the courtroom at any particular time and was attempting to be patient and to safeguard the constitutional rights of the defendant by allowing extra time for him to have proper clothes.
"So, that's the situation as I recall it from this morning, an hour and fifteen minutes ago. I don't know what the problem was, but, it's not a factor to me. His family furnished clothes, I assume.
"[Court official]: No, sir. The clothes were some work clothes that I had in my van that belong to me, sir. I'm 6'3", Mr. Dorsey is 5'7". I weigh 230, Mr. Dorsey probably weighs a 170, just something we were trying to get as an interim, sir. But, they were my clothes.
"The Court: I didn't know. But, faced with that problem, his family could certainly have brought him clothes here today and I would have certainly allowed him to have time to do that, in fact, I did allow him to have time expecting that his family were the ones that did furnish the clothes.
"Anything else we need to take up?"
(Emphasis added.) The record further reflects that, after panel two was questioned, Dorsey changed into the civilian clothes that his family had provided for him. The trial court did not force Dorsey to be tried in prison clothes.
The record reflects that, when Dorsey appeared before a portion of the venire in his prison clothes, counsel made no objection. This is indicated by the trial court's remarks quoted above. Dorsey gave the court no opportunity to cure any possible error. As we noted in Johnson v. State, 541 So.2d 1112, 1118 (Ala.Crim.App.1989), quoting Estelle v. Williams, 425 U.S. 501, 512, 96 S.Ct. 1691, 1697, 48 L.Ed.2d 126 (1976):
"`[A]lthough the State cannot, consistently with the Fourteenth Amendment, compel an accused to stand trial before a jury while dressed in identifiable prison clothes, the failure to make an objection to the court as to being tried in such clothes, for whatever reason, is sufficient to negate the presence of compulsion necessary to establish a constitutional violation."
Here, the fact that Dorsey appeared before the jury in his prison uniform and then later objected to the jury's seeing him in those clothes, tends to reflect that he invited any possible error that may have occurred. The doctrine of invited error applies in death-penalty cases and waives the error unless it rises to the level of plain error. See Whitehead v. State, 777 So.2d 781 (Ala.Crim.App.1999), aff'd, 777 So.2d 854 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001); Knight v. State, 675 So.2d 487 (Ala.Crim.App.1995), cert. denied, 675 So.2d 502 (Ala.1996).

VII.
Dorsey argues that the presence of members of the victim's family in the courtroom deprived him of a fair trial and an accurate sentencing determination. He concedes that § 15-14-56(a), Ala.Code 1975, specifically permits a trial court to allow family members of the victims to be excluded from the rule excluding witnesses from the courtroom.[5] He asserts that it *487 was error for the trial court to exempt four people from the rule and allow them to remain in the courtroom.
Section 15-14-56(a) states:
"Whenever a victim is unable to attend such trial or hearing or any portion thereof by reason of death; disability; hardship; incapacity; physical, mental, or emotional condition; age; or other inability, the victim, the victim's guardian or the victim's family may select a representative who shall be entitled to exercise any right granted to the victim, pursuant to the provisions of this article."
We have specifically recognized that § 15-14-56(a) applies to capital trials. "The Crime Victims' Court Attendance Act, § 15-14-50 et seq., which allows for a representative of deceased victim to be seated alongside the prosecutor at `trial or hearing or any portion thereof,' applies to capital offenses." Thomas v. State, 766 So.2d 860, 948 (Ala.Crim.App.1998), aff'd, 766 So.2d 975 (Ala.2000), citing Coral v. State, 628 So.2d 954, 984 (Ala.Crim.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994), and Williams v. State, 601 So.2d 1062, 1079 (Ala.Crim.App.1991), aff'd, 662 So.2d 929 (Ala.), cert. denied, 506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992).
Moreover, what Dorsey fails to consider is that there were three victims and three families represented in court. The record reflects that the trial court excluded Richard Cary's son and his wife from the rule; it excluded Crane's father from the rule; and it excluded Williams's sister from the rule. Also, there is no indication in the record that any of the family members were overly emotional or disruptive during the trial. The trial court's actions were consistent with Alabama law.

VIII.
Dorsey argues that the trial court's method of remedying a Batson[6] violation prejudiced him and mandated a new trial.
The record reflects that after defense counsel made his Batson objection and the trial court determined that four strikes violated Batson, the following occurred:
"The Court: All right. There is a method of dealing with Batson which has not been formally codified or adopted as a rule, but, it  it makes sense and that is that you take out proper jurors, put them in a pile, put everybody back in, including the ones that were improperly struck and pull out enough to make the list.
"[Defense counsel]: We have no objection to that, Your Honor.

"The Court: Since the last strike of each side was found to be all right, we'll leave the alternate selection as it was done originally.
"[Defense counsel]: That's fine, Your Honor.
"The Court: Any objection by the State?
"[Prosecutor]: No, sir."
(Emphasis added.) Of the four jurors the trial court determined had been struck improperly, three served on Dorsey's jury.
Dorsey did not object to the trial court's method of handling the Batson violation. Thus, we must review this issue for plain error. Rule 45A, Ala.R.App.P. Not only did Dorsey not object, but as shown above, he acquiesced in the trial court's method of remedying the Batson violation. Dorsey invited any error that *488 he now claims on appeal. As we stated above, the doctrine of invited error applies in death penalty cases and waives the error unless it rises to the level of plain error. See Whitehead v. State, 777 So.2d 781 (Ala.Crim.App.1999), aff'd, 777 So.2d 854 (Ala.2000), cert. denied, 532 U.S. 907, 121 S.Ct. 1233, 149 L.Ed.2d 142 (2001); Knight v. State, 675 So.2d 487 (Ala.Crim.App.1995), cert. denied, 675 So.2d 502 (Ala.1996).
While Alabama has recognized that a proper way to remedy a Batson violation is to excuse the entire venire and to start anew, see Ex parte Branch, 526 So.2d 609 (Ala.1987), on remand, 526 So.2d 634 (Ala.Crim.App.1988), we have also held that another way to cure a Batson objection is to place a juror who was improperly removed back on the venire. See O'Neal v. State, 602 So.2d 462, 465 (Ala.Crim.App.1992). The United States Supreme Court in Batson specifically refused to "formulate particular procedures" to remedy a Batson violation; instead it left this decision to the state and federal courts. Batson, 476 U.S. at 99, 106 S.Ct. 1712.
The Maryland Court of Appeals in Jones v. State, 343 Md. 584, 683 A.2d 520 (1996), thoroughly reviewed the methods of curing Batson violations used by the different state and federal courts. The Jones court stated:
"Some jurisdictions require trial courts finding a Batson violation to disallow the strike or to re-seat the improperly stricken juror. See Ellerbee v. State, 215 Ga.App. 312, 450 S.E.2d 443, 448 (1994); State v. Grim, 854 S.W.2d 403, 416 (Mo.1993), cert. denied, Grim v. Missouri, 510 U.S. 997, 114 S.Ct. 562, 126 L.Ed.2d 462 (1993) (`[T]he proper remedy for discriminatory use of peremptory strikes is to quash the strikes and permit those members of the venire stricken for discriminatory reasons to sit on the jury if they otherwise would.'); Conerly v. State, 544 So.2d 1370 (Miss.1989)(`Having determined that the state's explanation did not provide a valid reason for striking Swain, the trial court was obligated to seat her on the jury unless the state could suggest another racially neutral reason for striking her.'); U.S. v. Robinson, 421 F.Supp. 467, 474 (D.Conn.1976), aff'd, 556 F.2d 562 (2nd Cir.1977).
"A minority of jurisdictions require the trial court to discharge the entire venire and conduct jury selection from a newly convened venire. See State v. McCollum, 334 N.C. 208, 433 S.E.2d 144, 159 (1993), cert. denied, McCollum v. North Carolina, 512 U.S. 1254, 114 S.Ct. 2784, 129 L.Ed.2d 895 (1994) (the court noted that while neither reseating the stricken jury nor discharging the entire panel was inconsistent with the procedure required by Batson to remedy such a violation, `the simpler and ... clearly fairer approach is to begin the jury selection anew....'); People v. Wheeler, 22 Cal.3d 258, 148 Cal.Rptr. 890, 907, 583 P.2d 748, 765 (1978). See Minniefield v. State, 539 N.E.2d 464 (Ind.1989) (holding that the trial court erred by failing to grant mistrial as result of prosecution's Batson violation).
"The majority of courts, however, have delegated to the discretion of the trial judge the determination of the appropriate remedy for a Batson violation. See e.g. State v. Franklin, 318 S.C. 47, 456 S.E.2d 357, 360 (1995), cert. denied, Franklin v. South Carolina, 516 U.S. 856, 116 S.Ct. 160, 133 L.Ed.2d 103 (1995) (`We hold ... that it is within the trial judge's discretion to fashion the appropriate remedy under the particular facts of each case' .... (citation omitted)); Ezell v. State, 909 P.2d 68, 72 (Okla.Crim.App.1995) (`We adopt this *489 flexible approach as the best solution. We interpret Batson as suggesting that either remedy may be appropriate depending on the particular circumstances at trial'). Commonwealth v. Fruchtman, 418 Mass. 8, 633 N.E.2d 369, 373 (1994), cert. denied, Fruchtman v. Massachusetts, 513 U.S. 951, 115 S.Ct. 366, 130 L.Ed.2d 319 (1994) (`Choice of remedy was ... the prerogative of the judge'); Haschke v. Uniflow Manufacturing Co., 268 Ill.App.3d 1045, 206 Ill.Dec. 387, 391, 645 N.E.2d 392, 396 (1994); Friedman v. State, 654 So.2d 50, 52 (Ala.Crim.App.1994), cert. denied, No. 1940189 (Ala.1995); Koo v. State, 640 N.E.2d 95, 100 (Ind.Ct.App.1994) (`Clearly, the remedy which a particular trial court employs upon a finding of purposeful discrimination is a matter left to the court's discretion.'); State ex rel. Curry v. Bowman, 885 S.W.2d 421, 425 (Tex.Crim.App.1993), cert. denied, Texas v. Bowman, 513 U.S. 866, 115 S.Ct. 184, 130 L.Ed.2d 118 (1994) (`[W]here a Batson claim is sustained the court may fashion a remedy in its discretion....'); Jefferson v. State, 595 So.2d 38, 41 (Fla.1992) (`[I]t is within the trial judge's discretion to fashion the appropriate remedy under the particular facts of each case....'); People v. Irizarry, 165 A.D.2d 715, 560 N.Y.S.2d 279, 281 (1990); State v. Walker, 154 Wis.2d 158, 453 N.W.2d 127, 135 n. 12 (1990), cert. denied, 498 U.S. 962, 111 S.Ct. 397, 112 L.Ed.2d 406 (1990); U.S. v. Forbes, 816 F.2d 1006, 1011 (5th Cir.1987)."
343 Md. at 594-95, 683 A.2d at 525-26. Alabama is one of the jurisdictions that leave the choice of the method to deal with a Batson violation to the sound discretion of the trial court. See Ex parte Branch, supra. Alabama has never required that the trial court follow a certain procedure. We believe that the method used will depend on the facts presented in each case.
Here, Dorsey specifically condoned the trial court's method of correcting the Batson violation. There is no evidence that the method the trial court used resulted in racial bias. Although, our research revealed no case that has approved of this method of curing a Batson violation, neither did our research reveal any case that condemned this method.
Moreover, the holding in Batson was premised on the conclusion that a juror's right to equal protection of the law was violated when that juror was removed based solely on his/her race. Here, the improperly removed jurors were included in a random drawing to select the final jury. This procedure cured any equal protection challenge that any of the impermissibly struck jurors had to the jury selection process. Thus, by removing the equal protection violation the trial court removed any perceived challenge to the integrity of process.
The facts of this case are analogous to the situation where a defendant improperly removes a prospective juror using one of his peremptory strikes and then demands a new trial on appeal based on his strike of that juror. One court, addressing the issue of a defendant who improperly removed a juror and then argued error on appeal, stated:
"Criminal jurisprudence simply cannot allow a defendant to benefit from error he creates. In an era where jury selection and the entire structure of criminal trials is being questioned on grounds of fairness and effectiveness, this result will undermine respect for the criminal justice system as surely as the practice of discriminating against jurors on the basis of race."
Ezell v. State, 909 P.2d 68, 73 (Okla.Crim.App.1995).
*490 Based on the record, we find no plain error or any abuse of the trial court's discretion.

IX.
Dorsey argues that the trial court erred in allowing photographs of the crime scene and the victims and photographs of the victims after autopsies had been performed, to be introduced into evidence at trial. He asserts that these photographs were unduly prejudicial, that they inflamed the passions of the jury, and that they were cumulative of testimony of police officers and the coroner.
`"Photographic evidence is admissible in a criminal prosecution if it tends to prove or disprove some disputed or material issue, to illustrate some relevant fact or evidence, or to corroborate or dispute other evidence in the case. Photographs that tend to shed light on, to strengthen, or to illustrate other testimony presented may be admitted into evidence. Chunn v. State, 339 So.2d 1100, 1102 (Ala.Cr.App.1976). To be admissible, the photographic material must be a true and accurate representation of the subject that it purports to represent. Mitchell v. State, 450 So.2d 181, 184 (Ala.Cr.App.1984). The admission of such evidence lies within the sound discretion of the trial court. Fletcher v. State, 291 Ala. 67, 277 So.2d 882, 883 (1973); Donahoo v. State, 505 So.2d 1067, 1071 (Ala.Cr.App.1986) (videotape evidence). Photographs illustrating crime scenes have been admitted into evidence, as have photographs of victims and their wounds. E.g., Hill v. State, 516 So.2d 876 (Ala.Cr.App.1987). Furthermore, photographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters. E.g., Burton v. State, 521 So.2d 91 (Ala.Cr.App.1987). Finally, photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors. Hutto v. State, 465 So.2d 1211, 1212 (Ala.Cr.App.1984).'
"`Ex parte Siebert, 555 So.2d 780, 783-84 (Ala.1989), cert. denied, 497 U.S. 1032, 110 S.Ct. 3297, 111 L.Ed.2d 806 (1990). See also Kuenzel v. State; Ivery v. State[, 686 So.2d 495 (Ala.Cr.App.1996)]; C. Gamble, McElroy's Alabama Evidence, § 207.01(2) (5th ed.1996). We have examined the photographs introduced into evidence in this case, and applying the legal principles set out above to the facts of this case, we conclude that the trial court did not abuse its discretion in admitting the photographs into evidence at either the guilt phase or the sentencing phase of the trial.'
"Ingram v. State, 779 So.2d 1225, 1273 (Ala.Cr.App.1999)."
Smith v. State, 795 So.2d 788, 821 (Ala.Crim.App.2000), cert. denied, 795 So.2d 842 (Ala.2001).
We have reviewed the photographs and conclude that the trial court did not abuse its discretion in admitting them into evidence.

X.
Dorsey argues that he was prejudiced because, he says, the trial court prevented him from presenting evidence in his defense. He cites several different reasons in support of this contention.

A.
Dorsey argues that the trial court erred in not allowing him to call Gary Wayne *491 Henderson and Johnny Likely as witnesses. Dorsey argues that Henderson was prepared to testify that Likely had told him, while he and Likely were incarcerated together, that he and two white boys had committed the murders.[7] He asserts that Likely's testimony was admissible based on the United States Supreme Court's holding in Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).
The trial court had several discussions with defense counsel about calling these witnesses, and it made it perfectly clear that the defense could subpoena whoever it wanted to subpoena. Henderson was brought to the courthouse to testify. The following occurred:
"[Defense counsel]: Okay. Judge, we've got two inmates who are upstairs, Gary Wayne Henderson and Billy Don Clark. We expect to offer evidence that Eddie Hands, Jr., and Johnny Likely are unavailable witnesses and at that time we expect to offer the testimony of Gary Wayne Henderson and Billy Don Clark regarding confessions that Mr. Hands and Mr. Likely made concerning the murders that occurred on November the 20th. The text of those is in our earlier motion that we filed with the Court requesting depositions, and I know the Court's already reviewed them, we'd adopt those by reference.
"Judge, I can give you copies of them now, if you want. It will be in the last couple of motions, Judge, when we asked about taking the depositions.
"Judge, I'll give you a copy right now.
"The Court: I got a motion for deposition of witnesses filed January 8.
"[Defense counsel]: Yes, sir. That's it. Should be attached as an exhibit to that motion.
"The Court: Are there just two pages on Billy Clark?
"[Defense counsel]: Yes, sir, Judge. Two pages on Billy Clark and one  two pages on Mr. Henderson, I think. Yes.
"Judge, we would offer both of those statements under the excited-utterance exception of the hearsay rule and although Alabama has not adopted it, under due process laws we think it's required that we'd be allowed to offer statements against penal interest which are accepted by the Federal Courts as competent testimony, competent evidence. And that in a capital case Alabama's evidentiary rules should be changed to allow that testimony. But, also under the excited-utterance exception.
"The Court: Now why is Hand unavailable?
"[Defense counsel]: Judge, it's my understanding he hadn't been served. We issued a subpoena for him.
"The Court: Where is he located?
"[Defense counsel]: Monroe County to the best of our knowledge.
"The Court: What's his name?
"[Defense counsel]: Eddie Hands, Jr. 113 Harvestine Drive, Frisco City, Alabama is the best address we've been able to obtain. At the time his statements were taken he was incarcerated and was subsequently released and *492 that's why we've had a little bit of a problem trying to track him down.
"The Court: All right. With respect to Eddie Hands, Jr. I would grant the State's motion in limine. It does not qualify for admission under the law of Alabama.
"[Defense counsel]: What about on Mr. Henderson? I mean  yeah, Mr. Likely and Mr. Henderson?
"The Court: Where is Mr. Likely?
"[Defense counsel]: Judge, we issued a subpoena for him, he was served and, as far as I'm aware, he's never shown up at the trial of this case.
"The Court: I'm sorry. Where is he located?
"[Defense counsel]: Somewhere in Conecuh County.
"The Court: I'll immediately issue an attachment for Mr. Likely.
"[Defense counsel]: Fine, Judge.
"[Prosecutor]: Judge, assuming he is attached you want to look at what he says because wouldn't it still be inadmissible?
"[Defense counsel]: That may be a question, Judge. I'd hate to put him up there is we can't then offer the statement if he denies it.
"The Court: Well, he would have to be unavailable by denial before you could offer his statement and even then Alabama law precludes the use of that statement.
"[Defense counsel]: That's kind of the point, Judge. In other words, if  if  if you're not going to let us use the statement if he denies, then, we'd rather not put him up there and just let him deny and then not be able to put this confession in. If  if it's not admissible as a matter of law, that's fine. If it's something we need to prove to get it admitted, then, we'll be glad to do that.
"The Court: All right. First of all, I'm not ruling that you cannot use the statement at this time. I'm ruling that it's not time for me to make that ruling until Mr. Likely takes the stand. So, I'm not giving you a conditional ruling. Mr.  if you decide to put Mr. Likely on the stand and if he denies, then, I will decide, at that point, whether or not it's admissible 
"[Defense counsel]: Judge, would you 
"The Court:  hearsay statement. But, I'm not precluding you from using Mr. Likely nor, at this time, am I ruling on the admissibility of that hearsay statement because it has not been offered nor is it before me at this time."
The record reflects that sometime later the sheriff's department picked Likely up and brought him to the courthouse to testify. Another discussion took place between counsel and the trial court. It appears that defense counsel believed, based on Likely's statement to an investigator, that Likely was going to deny any involvement in the murders and also deny making any statement to Henderson.[8] The trial court said that if Likely denied making the statement, Henderson's testimony as to what Likely told him would be admissible only for impeachment purposes and not as substantive evidence of another person's *493 guilt. The trial court's ruling was correct. See Hooper v. State, 585 So.2d 137 (Ala.1990), cert. denied, 503 U.S. 920, 112 S.Ct. 1295, 117 L.Ed.2d 517 (1992). After the trial court made this ruling, defense counsel stated that it was going to release Likely and Henderson as witnesses.
The trial court, when ruling on the admissibility of the hearsay evidence, applied the law as it existed at the time of trial. Traditionally, Alabama courts had held that hearsay evidence concerning a third party's guilt is not admissible. See C. Gamble, McElroy's Alabama Evidence, § 48.01(4) (5th ed.1996). See also Griffin v. State, 790 So.2d 267 (Ala.Crim.App.1999), rev'd, 790 So.2d 351 (Ala.2000).
After Dorsey was convicted, the Alabama Supreme Court in Ex parte Griffin, supra, recognized that there may be situations when hearsay evidence of a third-party's guilt is admissible against a claim that it violates the hearsay rule. The Supreme Court, relying on the United States Supreme Court's holding in Chambers v. Mississippi, supra, held that an accused's "constitutional rights [in that case] supersede[d] the hearsay rule in the Alabama Rules of Evidence." 790 So.2d at 355.
In Ex parte Griffin, the accused sought to introduce evidence that a third party had pleaded guilty to the crime for which Griffin was charged, that the plea was taken in an Alabama court under oath, and that this individual had served four years in prison for the crime for which Griffin was on trial. The Alabama Supreme Court, when holding that this evidence was admissible, stated:
"The United States Supreme Court has held that a defendant has a right to put on a defense and that that right includes the opportunity to present evidence proving that another person committed the offense for which he has been charged. See Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973); Washington v. Texas, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). However, this right is not absolute; instead, the trial court will have to consider the admissibility of such evidence in conjunction with other legitimate interests involved in the trial process. Chambers, 410 U.S. at 295, 93 S.Ct. 1038; see also Guam v. Ignacio, 10 F.3d 608 (9th Cir.1993). As a result, the trial court is presented with a balancing test in order to determine whether the evidence of a third party's culpability is properly admissible:
"`The court must weigh the defendant's "strong interest in presenting exculpatory evidence" against the state's interest "in promoting reliable trials, particularly in preventing the injection of collateral issues into the trial through unsupported speculation about the guilt of another party.'"
"United States v. Johnson, 904 F.Supp. 1303, 1311 (M.D.Ala.1995) (citations omitted). In weighing those interests, the federal courts have required the defendant to show that the evidence he is offering is probative and not merely speculation that would confuse the jury:
"`To satisfy this balancing test, there must be "some showing of a nexus between the other party and the particular crime with which a defendant is charged." Of course, this nexus must be substantial  that is, probative  and not tenuous or merely speculative.'
"Id. (citations omitted).
"Like the federal courts, Alabama courts have long recognized the right of a defendant to prove his innocence by presenting evidence that another person actually committed the crime. See Ex parte Walker, 623 So.2d 281 (Ala.1992); Thomas v. State, 539 So.2d 375 (Ala. *494 Crim.App. 1988); Green v. State, 258 Ala. 471, 64 So.2d 84 (1953); Underwood v. State, 239 Ala. 29, 193 So. 155 (1939); Orr v. State, 225 Ala. 642, 144 So. 867 (1932); Houston v. State, 208 Ala. 660, 95 So. 145 (1923); Tennison v. State, 183 Ala. 1, 62 So. 780 (1913); McGehee v. State, 171 Ala. 19, 55 So. 159 (1911); McDonald v. State, 165 Ala. 85, 51 So. 629 (1910). In addition, Alabama courts have also recognized the danger in confusing the jury with mere speculation concerning the guilt of a third party:
"`It generally is agreed that the defense, in disproving the accused's own guilt, may prove that another person committed the crime for which the accused is being prosecuted.... The problem which arises in the application of this general rule, however, is the degree of strength that must be possessed by the exculpatory evidence to render it admissible. The task of determining the weight that must be possessed by such evidence of another's guilt is a difficult one.'
"Charles W. Gamble, McElroy's Alabama Evidence § 48.01 (5th ed.1996). To remove this difficulty, this Court has set out a test intended to ensure that any evidence offered for this purpose is admissible only when it is probative and not merely speculative. Three elements must exist before this evidence can be ruled admissible: (1)the evidence `must relate to the "res gestae" of the crime'; (2) the evidence must exclude the accused as a perpetrator of the offense; and (3) the evidence `would have to be admissible if the third party was on trial.' See Ex parte Walker, 623 So.2d at 284, and Thomas, 539 So.2d at 394-96.
"....
"The State makes an additional argument as to Embry's guilty plea. It apparently argues in its brief that, even if the evidence of the plea passes the three-pronged test, at Griffin's trial Embry's plea is still hearsay that does not fall within any exception. Professor Gamble has stated:
"`The accused cannot ... prove the guilt of another by the use of hearsay statements. This hearsay ban constitutes the major barrier to exculpatory evidence, particularly in the form of a third party's confession to the crime with which the accused is charged. Such a statement could surmount a hearsay objection if it qualifies under some hearsay exception.'
"McElroy's Alabama Evidence, § 48.01(1). However, Gamble also notes that a situation could arise where `an accused's constitutional right to present his defense would dictate admission of evidence suggesting another's guilt,' Id. The United States Supreme Court has encountered such a situation, where the defendant's due-process rights conflicted with the rules of evidence. In Chambers, the Court stated: `In these circumstances, where constitutional rights directly affecting the ascertainment of guilt are implicated, the hearsay rule may not be applied mechanistically to defeat the ends of justice.' 410 U.S. at 302, 93 S.Ct. 1038.
"....
"[W]e follow the United States Supreme Court's holding in Chambers and hold that Griffin's constitutional rights supersede the hearsay rule in the Alabama Rules of Evidence. However, in doing so, we note that not in every case will the defendant's right to present his defense supersede the hearsay rule; it will supersede that rule only in those cases that, as indicated by the first two elements of the test stated above, have a probative alternative theory of culpability *495 and not an alternative theory that is merely speculative and meant only to confuse the jury."
790 So.2d at 353-55. (Emphasis added.)
Other courts, like the Alabama Supreme Court in Griffin, have recognized that the main concern when applying the Chambers holding is whether the hearsay evidence has a "sufficient indicia of reliability." See Card v. Dugger, 911 F.2d 1494 (11th Cir.1990) (noting that the Chambers Court cited four facts that made the hearsay statements reliable: "(1) the time of the declaration and the party to whom the declaration was made; (2) the existence of corroborating evidence in the case; (3) the extent of which the declaration is really against a declarant's penal interest; and (4) the availability of the declarant as a witness, that is, whether the state could cross-examine him regarding his statements." 911 F.2d at 1515); Turner v. State, 267 Ga. 149, 476 S.E.2d 252 (1996) ("must have `particularized guarantees of trustworthiness,' that is, it must be `coupled with circumstances which attribute verity to it.'" 476 S.E.2d at 258); Davis v. State, 194 Ga.App. 482, 391 S.E.2d 124 (1990) ("In those cases in which the United States Supreme Court has ruled the confession of a third party to be admissible as an exception to hearsay, the Court found strong indicia of reliability of the out-of-court statement. In Chambers, the third-party declarant had made three separate admissions of guilt to three different people, the statements bore persuasive assurances of trustworthiness and the declarant was available for cross-examination by the State so that his demeanor and responses could be weighed by the jury. In Green v. Georgia, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979), the Supreme Court held that, pursuant to the Due Process Clause of the Fourteenth Amendment, testimony concerning the confession of a codefendant should have been admitted in the sentencing phase of trial because it was relevant and because of its reliability); Alderman v. Zant, 22 F.3d 1541 (11th Cir.), cert. denied, 513 U.S. 1061, 115 S.Ct. 673, 130 L.Ed.2d 606 (1994) ("It is generally true that a defendant must be permitted to introduce any mitigating evidence at the sentencing phase of a capital case if the evidence relates to the defendant's character, record or the circumstances of the particular offense.... However, a judge still retains the discretion to exclude otherwise inadmissible evidence which it determines lacks considerable assurances of trustworthiness. Chambers, 410 U.S. at 300, 93 S.Ct. at 1048." 22 F.3d at 1557); Jones v. State, 709 So.2d 512 (Fla.1998) ("[U]nlike the confessions in Chambers, the alleged confessions in this case lack indicia of trustworthiness.... The confessions were not made prior to the original trial in circumstances indicating trustworthiness, such as spontaneously to a close acquaintance as in Chambers, or to his own counsel or the police shortly after the crime, ... but were made to a variety of inmates with whom [the witness] served prison time." 709 So.2d at 525).
This case is similar to the circumstances presented to a Florida court in Jones v. State, where that court held that the statements lacked "indicia of trustworthiness" and, therefore, were not admissible. In Jones, two inmates testified that a third party had told them that he had committed the murder that Jones had been accused of committing. The Florida Supreme Court, holding that the trial court correctly excluded this evidence, stated:
"[U]nlike the confessions in Chambers, the alleged confessions in this case lack indicia of trustworthiness. The fact that more inmates have come forward does not necessarily render the confessions trustworthy. The confessions were not made prior to the original trial in circumstances *496 indicating trustworthiness, such as spontaneously to a close acquaintance as in Chambers, or to his own counsel or the police shortly after the crime, see, e.g., Wilkerson v. Turner, 693 F.2d 121 (11th Cir.1982); United States ex rel. Gooch v. McVicar, 953 F.Supp. 1001 (N.D.Ill.1997), but were made to a variety of inmates with whom Schofield served prison time.
"....
"While it may be that the inmates were testifying falsely, it may also be that Schofield bragged about a killing he did not commit. An individual's alleged confession to a capital murder would generally be considered to be against one's penal interest. However, in a prison environment, statements concerning involvement in the murder of a police officer may be viewed differently. We noted in Jones' previous 3.850 [postconviction] appeal that `a statement by one criminal to another criminal... is more apt to be jailhouse braggadocio than a statement against his criminal interest.' Jones, 678 So.2d at 314 (quoting United States v. Seabolt, 958 F.2d 231, 233 (8th Cir.1992)). In fact one inmate testified that Schofield told him that he `got his stripes' by killing a police officer. As Judge Soud observed in his 1992 order, among prisoners a claim of involvement in a police officer's murder may in fact elevate the inmate's status or reputation."
709 So.2d at 525-26.
Here, we do not have the situation that was presented in Griffin. In Griffin, the evidence that was introduced had a high degree of reliability. There is absolutely no indicia of reliability in a statement made by one inmate to another inmate. The facts of this case are distinguishable from those presented in Griffin; thus, Griffin does not mandate a reversal in this case. There is absolutely no evidence in the record that the statements bore such a degree of reliability that we would depart from the long-standing rule regarding the exclusion of hearsay evidence. In fact, Likely, when questioned about the statement he was said to have made to Henderson, told investigators that he did not make the statement. Likely was prepared to testify, but defense counsel did not want him to testify. Defense counsel knew that if Likely denied the statement then Henderson's testimony as to what Likely told him was admissible only for impeachment purposes and not as substantive evidence of another person's guilt. The trial court did not err in excluding this evidence.
Dorsey also argues that it was error not to allow Likely's statement into evidence at the penalty phase of the proceedings. He asserts that he had an "unabridged right" to present hearsay evidence at the penalty phase of his trial. We do not agree.
The United States Supreme Court in Green v. Georgia, 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979), citing Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973), held that hearsay evidence of a third party's guilt may be admissible at the penalty phase of a capital trial. The Court stated:
"Regardless of whether the proffered testimony comes within Georgia's hearsay rule, under the facts of this case its exclusion constituted a violation of the Due Process Clause of the Fourteenth Amendment. The excluded testimony was highly relevant to a critical issue in the punishment phase of the trial, see Lockett v. Ohio, 438 U.S. 586, 604-605, 98 S.Ct. 2954, 2964-2965, 57 L.Ed.2d 973 (1978) (plurality opinion); id., at 613-616, 98 S.Ct., at 2969-2970 (opinion of Blackmun, J.), and substantial reasons *497 existed to assume its reliability. Moore made his statement spontaneously to a close friend. The evidence corroborating the confession was ample, and indeed sufficient to procure a conviction of Moore and a capital sentence. The statement was against interest, and there was no reason to believe that Moore had any ulterior motive in making it. Perhaps most important, the State considered the testimony sufficiently reliable to use it against Moore, and to base a sentence of death upon it. In these unique circumstances, `the hearsay rule may not be applied mechanistically to defeat the ends of justice.' Chambers v. Mississippi, 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297 (1973)."
442 U.S. at 97, 99 S.Ct. 2150.
The United States Court of Appeals for the Eleventh Circuit was presented with a similar argument in Alderman v. Zant, 22 F.3d 1541 (11th Cir.), cert. denied, 513 U.S. 1061, 115 S.Ct. 673, 130 L.Ed.2d 606 (1994). In Alderman v. Zant, the petitioner in a capital case alleged that he was entitled to a new sentencing hearing in a capital case because the trial court did not allow hearsay evidence of what one inmate had confessed to another inmate about the charged murder. The court stated:
"It is generally true that a defendant must be permitted to introduce any mitigating evidence at the sentencing phase of a capital case if the evidence relates to the defendant's character, record or the circumstances of the particular offense. Lockett v. Ohio, 438 U.S. 586, 604, 98 S.Ct. 2954, 2964-65, 57 L.Ed.2d 973 (1978). However, a judge still retains the discretion to exclude otherwise inadmissible evidence which it determines lacks considerable assurances of trustworthiness. Chambers, 410 U.S. at 300, 93 S.Ct. at 1048."
Here, because Likely's statement bore no indicia of reliability, the trial court did not err in excluding this information from the penalty phase of Dorsey's capital trial.

B.
Dorsey argues that the trial court erred in preventing him from engaging in a thorough cross-examination of witnesses. He cites several different reasons in support of this contention.

1.
The first challenged portion of the record appears during the cross-examination of Simon Benson, an investigator with the Alabama Bureau of Investigations. This witness was called by the State to identify a photograph of a one-dollar bill discovered near the scene of the murders. After Benson identified this photograph, defense counsel extensively cross-examined this witness about the investigation of the murders and about the search of the Cary residence. The following occurred:
"Q [Defense counsel]: Okay. Did you later assist in the search of the Cary residence in January?
"A: No, I did not.
"Q: Okay. Is it normal to conduct a search of a residence looking for evidence of a murder case two months after the people are killed?
"[Prosecutor]: Object to the question, Judge.
"The Court: Sustain."
Whether it was normal to conduct a search of a residence two months after a murder was not relevant to any fact in this case. The trial court has the discretion to limit cross-examination to matters that are relevant. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable *498 or less probable than it would be without the evidence." Rule 401, Ala.R.Evid.
As we stated in Reeves v. State, 807 So.2d 18, 38 (Ala.Crim.App.2000):
"It is well settled that `[a] party is entitled to a thorough and sifting cross-examination of the witnesses against him,' McMillian v. State, 594 So.2d 1253, 1261 (Ala.Crim.App.1991), remanded on other grounds, 594 So.2d 1288 (Ala.1992), opinion after remand, 616 So.2d 933 (Ala.Crim.App.1993), citing Perry v. Brakefield, 534 So.2d 602 (Ala.1988), and that a party should be given `wide latitude on cross-examination to test a witness's partiality, bias, intent, credibility, or prejudice, or to impeach, illustrate, or test the accuracy of the witness's testimony or recollection as well as the extent of his knowledge.' Williams v. State, 710 So.2d 1276, 1327 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998). It is equally well established, however, `that the latitude and extent of cross-examination are matters which of necessity rest largely within the sound discretion of the trial court, and rulings with respect thereto will not be revised on appeal except in extreme cases of abuse.' Long v. State, 621 So.2d 383, 388 (Ala.Crim.App.1993), cert. denied, 510 U.S. 932, 114 S.Ct. 345, 126 L.Ed.2d 310 (1993), quoting Beavers v. State, 565 So.2d 688, 689 (Ala.Crim.App.1990). `The trial judge may reasonably limit the range of cross-examination on matters that are repetitious, argumentative, collateral, irrelevant, harassing, annoying, or humiliating.' Newsome v. State, 570 So.2d 703, 714 (Ala.Crim.App.1989). `On appeal, the party claiming an abuse of such discretion bears the burden of persuasion.' Ross v. State, 555 So.2d 1179, 1180 (Ala.Crim.App.1989), quoting Hembree v. City of Birmingham, 381 So.2d 664, 666 (Ala.Crim.App.1980)."

2.
Dorsey also argues that the trial court erred in denying him the right to question some defense witnesses about the circumstances surrounding the issuance of the search warrant for Cary's residence. The following occurred during the direct examination of defense witness Warren Stewart:
"Q [Defense counsel]: Okay. On January 15 you applied for an affidavit for a search warrant, right?
"A: That's correct.
"Q: That's  tell the jury the process of obtaining a search warrant.
"[Prosecutor]: Object to it, Your Honor, it's irrelevant and immaterial.
"The Court: I'm sorry. What was the question.
"[Defense counsel]: Ask him to tell the jury about the process of obtaining a search warrant.
"The Court: Sustain.
"Q: Did you obtain a search warrant on January 15th?
"A: I did.
"Q: For whose premises?
"[Prosecutor]: Object to it, Your Honor, irrelevant and immaterial.
"[Defense counsel]: Judge, he's already 
"The Court: Sustain.
"[Defense Counsel]: There's already evidence about the search in their direct case.
"The Court: I'll allow you to go into it.
"[Defense counsel]: Thank you, Judge."
The above portion of the record shows that the trial court was very lenient about *499 allowing questions concerning the search of the Cary house. This witness was allowed to testify that the police were looking for any evidence of a crime. He was allowed to testify that a ".16 gauge shotgun shells, a  two . 16 gauge shotgun shells, a pair of tennis shoes, two other .16 gauge shotgun shells, unfired and a coat, olive green coat belonging to Brad Cary" were seized from the Cary residence; he was also allowed to testify that he questioned Cary about the murders. Moreover, this witness was allowed to testify that Brad had said, when the gun was discovered beside the road, that maybe the police would leave him alone. There is no evidence in the record that the trial court unconstitutionally limited Dorsey's cross-examination of this witness.
Moreover, a State witness had already testified that a .38 revolver, a .357 magnum revolver, a .22 revolver, two .22 pistols and a .22 rifle had been recovered from the Cary residence.

3.
Dorsey also argues that the trial court erred in limiting his cross-examination about the reward money. During Investigator Benson's testimony, the defense introduced evidence that Cary's family had offered a $10,000 reward for the arrest and conviction of the individual or individuals responsible for the murders. Dorsey asserts that he was not allowed to cross-examine this witness about the fact that reward money is often not released until after a trial. The record reflects that this witness was allowed to testify that there was a $10,000 reward for information that would lead to the arrest and conviction of the individual who had committed the Brooklyn murders. He also stated that to his knowledge no reward money had ever been paid.
The normal procedure for handling reward money was never shown to be relevant in this case. Rule 401, Ala.R.Evid. There was no evidence that any witness had been promised any reward money for his or her help in prosecuting Dorsey. Moreover, Dorsey made no attempt to question any state witness about their receiving any reward money. There was no error in excluding this testimony.

4.
Dorsey argues that the trial court erred in not allowing him to cross-examine Brad Cary about Richard Cary's allegedly growing marijuana on his property. Dorsey argues that this evidence should have been admissible because it went toward establishing a motive for Brad Cary to kill his father.
McElroy's Alabama Evidence states:
"Evidence that another person possessed a motive to commit the crime for which the accused is being prosecuted may have a tendency to make it more probable that such other committed the crime than it would be without the evidence. However, motive evidence is generally irrelevant without the presence of other evidence indicating such other's guilt. Such a determination, of course, is vested within the considerable discretion of the trial court."
C. Gamble, McElroy's Alabama Evidence § 48.01(7) (5th ed.1996).
When Dorsey attempted to introduce this evidence during the cross-examination of Brad Cary the trial court stated: "That question does not tend to show that another person possessed a motive. I'll disallow it at this time. If you wish to call the witness back to the stand at a later time once you establish enough facts where that might be relevant." The court then noted that "motive evidence must be buttressed with other evidence indicating that some other person committed the crime." The trial court's ruling was correct. *500 See McElroy's Alabama Evidence § 48.01(7).
This matter was not raised again. Therefore, we apply a plain-error review. Rule 45A, Ala.R.App.P.
The fact that one of the victims, Richard Cary, was growing marijuana, did not, alone, establish a motive for Brad to kill Richard Cary. Also, as the trial court indicated, Dorsey was free to call this witness later when he had presented other facts to corroborate his assertion that this evidence indicated that Brad Cary had a motive to murder his father. Based on the record in this case we find no error, much less plain error.

5.
Dorsey argues that the trial court erred in excluding evidence indicating that Brad and Michael Cary had taken polygraph examinations. Polygraph evidence is not admissible in a criminal proceeding. See Hinton v. State, 548 So.2d 562 (Ala.), cert. denied, 493 U.S. 969, 110 S.Ct. 419, 107 L.Ed.2d 383 (1989).
"In Frye v. United States, [293 F. 1013 (D.C.Cir.1923)] it was held that the lie detector test had not gained the standing and recognition in the scientific community sufficient to admit its results through expert opinion. In the more than fifty years since the Frye decision, the lie detector test still has not gained the required acceptance. Consequently, the results of such a test are generally inadmissible in both civil and criminal cases. The exclusion precludes, in addition to evidence of test results, evidence of the fact that a person did or did not take a lie detector test."
McElroy's Alabama Evidence § 490.01(4). This evidence was correctly excluded.

XI.
Dorsey argues that the trial court erred in allowing allegedly hearsay evidence to be introduced by the State. He asserts that the admission of this evidence resulted in reversible error. He cites several different portions of the record to support this assertion.
"Hearsay" evidence is defined in the Alabama Rules of Evidence as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Rule 801(c), Ala.R.Evid.
Dorsey first argues that the following testimony that occurred during Calvin Middleton's testimony was hearsay[9]:
"Q [Prosecutor]: Did you have any further discussion with Rodney about what happened that night?
"A: Yes, sir.
"Q: Tell the jury what that was.
"[Defense counsel]: Judge, we make the same objection about hearsay, 802 [Ala.R.Evid.].
"The Court: Overrule.
"Q: Tell the  tell the jury what that was.
"A: That we had killed somebody.
"Q: All right. Is that the words you used?
"A: No, sir.
"Q: What  what did you exactly tell him?
"A: We pulled some 187s.
"Q: What does 187 mean?

*501 "A: Murder."
"Q [Prosecutor]: All right. Did y'all have any further discussions once you got in the car?
"A: Yes. We asked Rodney did he want to go.
"[Defense counsel]: Judge, I'm going to object and move  ask if we can approach on this, Judge.
"The Court: Come on up.
"....
"Q: Tell the jury what you told or what you said or what was said to Rodney then.
"A: I asked him did he want to go.
"Q: What did he say?
"A: No.
"Q: Okay. Did you tell him where y'all were going?
"A: Yes, I did.
"Q: What did you tell him?
"A: Down to Brooklyn to rob somebody."
"Q [Prosecutor]: Did you have any further discussion with Rodney about what happened that night?
"A: Yes, sir.
"Q: Tell the jury what that was.
"[Defense counsel]: Judge, we make the same objection about hearsay, 802.
"The Court: Overrule.
"Q: Tell the  tell the jury what that was.
"A: That we had killed somebody."
This evidence was not hearsay. Middleton either testified to what he told Brooks or to what Dorsey told Brooks. Middleton's own statements were, by definition, not hearsay. Rule 801(d)(2), Ala.R.Evid. The statements that Middleton testified were made by Dorsey were correctly received under Rule 801(d)(2), Ala.R.Evid. because they were admissions by a party opponent. Rule 801(d)(2), Ala.R.Evid., states that such statements are admissible if "[t]he statement is offered against a party and is ... the party's own statement in either an individual or a representative capacity...." According to this section these statements were not hearsay.
Dorsey also argues that the following testimony elicited from Brad Cary was hearsay and that its admittance constituted reversible error:
"Q [Prosecutor]: Well, since you didn't think anything about it, then what did you do then?
"A: I was  I was going to go out and see what they had shot. So, my  I asked my mom, I told her I was going to the store and she said wait, they still may be shooting.
"[Defense counsel]: Judge, I'd object to that conversation as hearsay.
"The Court: Overrule."
Clearly, Cary's explanation of what his mother said was not offered for the truth of the matter asserted, and, thus, by definition was not hearsay. Rule 801(c), Ala.R.Evid.
Dorsey also challenges the following exchanges that took place during Rodney Brooks's testimony:
"Q [Prosecutor]: All right, sir. Did you hear any conversation between Ethan and anyone else in the house?
A: Rod, Rod Lawrence. He asked Rod for some money 
"[Defense counsel]: Judge, we'd object to this on hearsay grounds.
"[Prosecutor]: It's a statement that the defendant made, Judge.
"The Court: What now?
"[Prosecutor]: Statement the defendant made.

*502 "[Defense counsel]: Judge, all statements the defendant made  (inaudible) 
"The Court: Overrule.
"Q: What did Ethan say?
"A: He asked Rod for some money."
"Q [Prosecutor]: Did you and Calvin have any conversation then in the club?
"A: Yes, sir.
"Q: What did he have to say?
"[Defense counsel]: Objection, 802 [Ala.R.Evid.].
"The Court: Overrule.
"Q: What did Calvin say?
"A: He said that they hit a store in Brooklyn."
Brooks's testimony as to Dorsey's statements was not hearsay. As stated above, these were admissions by a party opponent that were properly introduced at trial. Rule 801(d)(2), Ala.R.Evid. There was no violation of the hearsay rule here.

XII.
Dorsey next argues that numerous instances of what he alleges is prosecutorial misconduct denied him a fair trial. He cites 10 instances in support of this argument.
When reviewing an issue concerning prosecutorial misconduct we are guided by the following principles:
"In Darden v. Wainwright, supra, the United States Supreme Court stated:
"`It "is not enough that the prosecutors' remarks were undesirable or even universally condemned." Darden v. Wainwright, 699 F.2d [1031] at 1036 [(1983)]. The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974).'
"477 U.S. at 181, 106 S.Ct. at 2471, 91 L.Ed.2d at 157.
"`Alleged prosecutorial misconduct must be viewed "`in the context of the entire trial and in light of any curative instructions....' United States v. Reed, 887 F.2d 1398, 1402 (11th Cir.1989), cert. denied, 493 U.S. 1080, 110 S.Ct. 1136, 107 L.Ed.2d 1041 (1990)."' Grayson v. State, 675 So.2d 516, 524 (Ala.Cr.App.1995), (citation omitted), cert. denied, 519 U.S. 934, 117 S.Ct. 309, 136 L.Ed.2d 225 (1996)."
Simmons v. State, 797 So.2d 1134, 1162-63 (Ala.Crim.App.), after remand, 797 So.2d at 1147 (Ala.Crim.App.2000). "`A prosecutor as well as defense counsel has a right to present his impressions from the evidence. He may argue every legitimate inference from the evidence and may examine, collate, sift, and treat the evidence in his own way.'" Thomas v. State, 766 So.2d 860, 944 (Ala.Crim.App.1998), aff'd, 766 So.2d 975 (Ala.2000), quoting Watson v. State, 398 So.2d 320, 328 (Ala.Cr.App.1980), cert. denied, 398 So.2d 332 (Ala.), cert. denied, 452 U.S. 941, 101 S.Ct. 3085, 69 L.Ed.2d 955 (1981). See also Wilkerson v. State, 686 So.2d 1266 (Ala.Crim.App.1996), and Wright v. State, 641 So.2d 1274 (Ala.Crim.App.1993). A prosecutor may also reply in kind to an argument of defense counsel, and that argument is admissible even if it would otherwise be barred. Donahoo v. State, 647 So.2d 24 (Ala.Crim.App.1994).
Dorsey did not object to most of the instances of alleged prosecutorial misconduct. While this will not bar our review it will weigh against any claim of prejudice that Dorsey makes on appeal. Williams v. State, 601 So.2d 1062 (Ala.Crim.App.), aff'd, 662 So.2d 929 (Ala.), *503 cert. denied, 506 U.S. 957, 113 S.Ct. 417, 121 L.Ed.2d 340 (1992). "`"This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.""' Williams, 601 So.2d at 1080, quoting Dill v. State, 600 So.2d 343, 356 (Ala.Crim.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993), quoting in turn Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991). "We recognize that instructions receive a more intense scrutiny from appellate courts than from the jurors themselves." Williams, 601 So.2d at 1080.

A.
Dorsey first argues that the prosecutor commented on his right not to testify when he made the following statement in his rebuttal argument in the guilt phase:
"Now what about the bump on the back of Richard's head? First of all, Richard's lying on his head. So, when he got around there he could have fell and got that bump or he could have got around there as Ethan was coming out that door and Ethan could have popped him. Remember Calvin is already gone. And by then all the witnesses are dead or going to be dead. They kill all the witnesses. They kill all the witnesses. And they almost got away with it except Calvin goes back and starts telling his buddy, Rod, Rodney."
There was no objection to the above comment; thus, our review is limited to plain error. Rule 45A, Ala.R.App.P.
The above comment was not a comment on Dorsey's failure to testify but was a response to an argument made by defense counsel to the effect that the State failed to explain the bump on Richard Cary's head. Certainly, the State is free to argue all legitimate inferences and to respond to counsel's arguments and questions.

B.
Dorsey next argues that the prosecutor improperly shifted the burden of proof to the defense by making the following argument in his rebuttal closing argument in the guilt phase:
"So, ladies and gentlemen of the jury, you can go back and look around and think about this case a little bit and you can think about two or three things; one, the defense didn't explain to you how it happened. I'm telling you how it happened."
There was no objection to the above comment; therefore, we must apply a plain-error analysis. Rule 45A, Ala.R.App.P.
When a similar argument was made in Miles v. State, 715 So.2d 913, 917 (Ala.Crim.App.1997), we stated:
"[T]he prosecutor's statements regarding the lack of testimony... were permissible. Rather than shifting the burden of proof, these statements constitute an effort to meet the prosecutor's own burden of proof by commenting on the lack of evidence. It is permissible for the prosecutor to ask the jury to draw inferences from the lack of evidence as well as from the evidence presented. Davis v. State, 290 Ala. 364, 365, 274 So.2d 363 (1973)."
Moreover, the trial court thoroughly instructed the jury, several times in its lengthy charge, that the State had the sole burden of proving Dorsey's guilt beyond a reasonable doubt. There was no error, much less plain error.

*504 C.
Dorsey argues that the prosecutor improperly vouched for the credibility of the State's witnesses.
There were no objections to any of the portions of the prosecutor's arguments challenged here. Therefore, we apply a plain-error analysis. Rule 45A, Ala.R.App.P.
We have evaluated the instances Dorsey cites in brief and find no impermissible argument. Each comment was based on facts presented during the witnesses' testimony, i.e., that no evidence had been presented during the witnesses' testimony that cast doubt on their credibility. As we stated in Thomas v. State, 766 So.2d 860, 942 (Ala.Crim.App.1998):
"These observations were permissible arguments concerning the credibility of the witnesses based upon the testimony presented at trial. Legitimate subjects of criticism and discussion during argument include `the credibility of the witnesses, as shown by their manner, the reasonableness of their story, their intelligence, means of knowledge, and many other considerations.' Gaddy v. State, 698 So.2d 1100, 1127 (Ala.Cr.App.1995), aff'd, 698 So.2d 1150 (Ala.), cert. denied, 522 U.S. 1032, 118 S.Ct. 634, 139 L.Ed.2d 613 (1997) (quoting Edson v. State, 53 Ala.App. 460, 464, 301 So.2d 226 (1974)). The prosecutor's remarks were grounded on the witnesses' testimony; the prosecutor was not attempting to personally vouch for them."
None of the cited comments were attempts by the prosecutor to personally vouch for the credibility of the State witnesses.

D.
Dorsey further argues that the prosecutor made personal attacks on his counsel and that those comments undermined the reliability of the jury's verdict and entitle him to a new trial. At several points in the prosecutor's rebuttal argument the prosecutor argued that the jury was being "conned," or "don't let a killer walk free because a lawyer walks in this courtroom and cons you," or that the jury was being "tricked."
Initially, we observe that at no point during the closing argument did Dorsey object to the now-challenged comments. Thus, we are limited to reviewing the record for plain error. Rule 45A, Ala.R.App.P.
As we stated in Whitlow v. State, 509 So.2d 252, 257 (Ala.Crim.App.1987):
"Disparagement of counsel for the accused is never proper and has no place in any trial of any case. 23A C.J.S. Criminal Law, § 1090 (1961); Thomas v. State, 393 So.2d 504 (Ala.Cr.App.1981). A prosecutor may strike `hard blows,' but not `foul blows.' Berger v. United States, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935); Crosslin v. State, 446 So.2d 675 (Ala.Cr.App.1983). `An attack on opposing counsel should be distinguished from a verbal assault on the accused.' Thomas, 393 So.2d at 509. `The range of a prosecutor's remarks has an important bearing on the extent of their impropriety. When he confines himself to an attack on opposing counsel personally, his remarks may expose him to censure by the court or discipline by the bar association, but will not usually be held prejudicial to the accused's right to a fair trial.' 99 A.L.R.2d 528 (1965); Thomas v. State, supra; Hurt v. State, 361 So.2d 1163 (Ala.Cr.App.1978). In this case, we interpret the prosecutor's words as an effort to bolster his case by demeaning opposing counsel in saying that counsel is displaying false emotions *505 before the jury. The prosecutor in fact is accusing defense counsel of intellectual dishonesty. `We do not condone the vituperative remarks made by the prosecutor. On the contrary, we condemn such remarks and the conduct of the prosecutor as being unworthy of his role as a prosecuting attorney.' Scroggins v. State, 341 So.2d 967, 971 (Ala.Cr.App.1976), cert. denied, 341 So.2d 972 (Ala.1977). The comment in this case, directed solely at appellant's counsel, was not prejudicial to the point of reversal."
While we do not condone these comments, we find no reversible error here. See Whitlow.

E.
Dorsey next argues that the prosecutor argued to the jury facts not in evidence. The following occurred:
"He [defense counsel] got up here and talked to you about a man being turned loose on death row because one of you jurors said that he was there when it happened. And he made a big point out of that so he could get one juror's attention. That's the kind of con you've been listening to. Now let's get it straight right now. I asked the Judge if I could reply in kind. I don't think that anybody ought to be framed, ladies and gentlemen of the jury. You don't either. I was the one that re-opened that case for that man on death row. And I'm the one that filed the motion that got him dismissed."
There was no objection to the above argument. Therefore, we are limited to determining whether there was plain error. Rule 45A, Ala.R.Crim.P.
As is evidenced by the opening portion of the above argument, this argument was a reply in kind to an argument by defense counsel. Defense counsel argued in his closing argument:
"We asked you about people being wrongfully accused. One of the jurors actually responded, had a man on death row, somebody had testified against him and came back and said, you know what, I lied. Down there six years, folks 
"....
"He was down there six years, folks. Man that was charged with the same kind  crime. Went in trial  went in trial and said me and him went and did it. Me and him went and did it. Actual case in the State of Alabama. Not somewhere out in California or just in my make believe possibility world, happened here. Sat on death row for six years."
The prosecutor's remarks were directed to the remarks made by defense counsel and were proper, given defense counsel's argument. As we stated in Chatom v. State, 619 So.2d 222, 224-25 (Ala.Crim.App.1993):
"`When the door is opened by defense counsel's argument, it swings wide, and a number of areas barred to prosecutorial comment will suddenly be subject to reply.' Davis v. State, 494 So.2d 851, 855 (Ala.Cr.App.1986). This court in Stephens v. State, 580 So.2d 11 (Ala.Cr.App.1990), aff'd, 580 So.2d 26 (Ala.), cert. denied, 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991), stated the following with regard to a prosecutor's statements in arguments:
"`" ... `[I]t must be examined in its context and in light of what had transpired, that is, in light of preceding argument of defense counsel, to which the prosecutor's argument was an answer.' Washington v. State, 259 Ala. 104, 65 So.2d 704 (1953); Gibson v. State, 347 So.2d 576 (Ala.Crim.App.1977); Rutledge v. State, [482 So.2d 1250] (Ala.Crim.App.1983). The rule *506 in Alabama is that `remarks or comments of the prosecuting attorney, including those which might otherwise be improper, are not grounds for reversal when they are invited, provoked, or occasioned by accused's counsel and are in reply to or retaliation for his acts and statements.' Shewbart v. State, 33 Ala.App. 195, 32 So.2d 241, cert. denied, 249 Ala. 572, 32 So.2d 244(147); Camper v. State, 384 So.2d 637 (Ala.Cr.App.1980); Wilder v. State, 401 So.2d 167 (Ala.1981), cert. denied, 454 U.S. 1057, 102 S.Ct. 606, 70 L.Ed.2d 595 (1981); Miller v. State, 431 So.2d 586 (Ala.Crim.App.1983); Rutledge, supra.'"
"Stephens, 580 So.2d at 21, quoting Henderson v. State, 460 So.2d 331, 333 (Ala.Cr.App.1984). See also Williams v. State, 601 So.2d 1062, 1074 (Ala.Cr.App.1991)."

F.
Dorsey argues that the prosecutor unlawfully urged the jury to do its "duty" and convict Dorsey of capital murder and improperly argued that the jury should convict Dorsey so that it could send a message to the community.
There was no objection to these challenged comments; thus, we are limited to determining whether plain error exists. Rule 45A, Ala.R.App.P.
Dorsey contends that it was error for the prosecutor to argue to the jury, in its opening statement, that at the end of the case it should do its duty and convict the defendant of capital murder. The prosecutor's last remark in his opening statement was that the jury should do its duty and convict. This remark was made after the prosecutor had discussed all of the evidence that the State was going to present against Dorsey. It is clear after reading the opening statement that this comment was meant to imply that, after hearing all of the evidence, the jury should convict Dorsey based on the State's case against him. As we stated in Thomas, 766 So.2d at 946-47:
"`Generally, the prosecutor is in error by exhorting the jury to "do what's right," or "do its job," if that exhortation "implies that, in order to do so, it can only reach a certain verdict, regardless of its duty to weigh the evidence and follow the court's instructions on the law."' McNair v. State, 653 So.2d at 339-40 (quoting Arthur v. State, 575 So.2d 1165, 1185 (Ala.Cr.App.1990), cert. denied, 575 So.2d 1191 (Ala.1991)) (citation omitted). Here, the prosecutor's exhortation to convict was expressly dependent on the jury's satisfaction that Thomas was guilty under the law. The prosecutor's remarks were proper, as an appeal for law enforcement. `An abundance of case law exists holding that urging the jury to render a verdict in such a manner as to punish crime, protect the public from similar offenses, and deter others from committing similar offenses is not improper argument.' Sockwell v. State, 675 So.2d 4, 36 (Ala.Cr.App.1993) (`send a message' to the people in the county by convicting the defendant), aff'd, 675 So.2d 38 (Ala.1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996). See also Smith v. State, 698 So.2d 189, 204 (Ala.Cr.App.1996) (`send a message' is proper appeal for law enforcement), aff'd, 698 So.2d 219 (Ala.), cert. denied, 522 U.S. 957, 118 S.Ct. 385, 139 L.Ed.2d 300 (1997)."

G.
Dorsey argues that it was improper for the prosecutor to argue to the jury that Dorsey's accomplice, Middleton, would be tried for capital murder. He attacks the following argument, made by *507 the prosecutor during rebuttal in the guilt phase:
"Calvin has confessed. Calvin has done got up here and tried to break into the penitentiary. And they want you to believe  they want to accuse us that as soon as it's over with that we're going to let him go.
"Now who are they accusing that of? Me? That's right. That accusation's leveled right at your District Attorney. He's going to stand trial for capital murder in this courtroom. And the only thing that won't be able to happen to him is he won't be able to get the death penalty. But, that confession he made will be used against him in Court. That's the law. And it will come out against him.
"And if a jury just like you stands here in that  in a courtroom and hears his confession they're going to convict Calvin and he's going to spend the rest of his life in prison. He'll be taken out in a pine box."
Defense counsel had made the following argument in his closing remarks:
"Now [the prosecutor] tells you he's got no reason to lie. He's going to prison with life without parole. Is that what he said? Do y'all remember? He didn't say that. He didn't say that. What did he say? Said, you know, you going to plead guilty or something. I ain't pleading guilty. Have you agreed to plead guilty? I ain't agreed to plead guilty. What's going to happen to you? I don't know. That's up to my lawyer. You going to get out on probation? Might. They going to dismiss the charges against you? Might. You know, are you going to go to prison forever? Might. I don't know.
"....
"You only get one shot, ladies and gentlemen. It's been a year. It's been a year. He [Middleton] hadn't pled guilty to anything.
"....
"Been a year. You know, I mean, I know the Court system is slow, but, it doesn't take that long to make a plea  (inaudible)  it doesn't take that long to plead guilty. You walk in front of a Judge and you say I did it. No plea agreement. No plea agreement. Just a blanket thing before they ever  before he ever came clean. Well, we  we definitely won't ever seek the death penalty on you. Come on, tell us something."[10]
After evaluating the arguments of counsel it is clear that the prosecutor was replying to the argument made by defense counsel that Middleton had yet to stand trial for the offense."' "When the door is opened by defense counsel's argument, it swings wide, and a number of areas barred to prosecutorial comment will suddenly be *508 subject to reply." DeFoor, Prosecutorial Misconduct in Closing Argument, 7 Nova L.J. 443, 469-70 (1982-83).' Davis v. State, 494 So.2d 851, 855 (Ala.Cr.App.1986)." George v. State, 717 So.2d 849, 854 (Ala.Crim.App.1997), aff'd, 717 So.2d 858 (Ala.1998), cert. denied, 525 U.S. 1024, 119 S.Ct. 556, 142 L.Ed.2d 462 (1998).
As this Court stated in Chandler v. State, 615 So.2d 100 (Ala.Crim.App.1992), cert. denied, 615 So.2d 111 (Ala.1993):
"`The prosecutor has a right to comment on and answer statements made by defense counsel in argument to the jury. Dollar v. State, 26 Ala.App. 361, 159 So. 704 (1935); Moragne v. State, 16 Ala.App. 26, 28, 74 So. 862, 864, reversed on other grounds, 200 Ala. 689, 77 So. 322 (1917). Counsel should be afforded wide latitude in responding to assertions made by opposing counsel in previous argument. York v. State, 34 Ala.App. 188, 190, 39 So.2d 694, 694 (1948), cert. denied, 252 Ala. 158, 39 So.2d 697 (1949). "Wide latitude is given the solicitor in making reply to argument previously made by appellant's counsel." Moody v. State, 40 Ala.App. 373, 374, 113 So.2d 787, 788 (1959). "Wide latitude is given a district attorney in making reply in kind, ... and the propriety of argument of counsel is largely within the trial court's discretion." Jetton v. State, 435 So.2d 167, 171 (Ala.Cr.App.1983).'"
615 So.2d at 110, quoting Dossey v. State, 489 So.2d 662, 665 (Ala.Crim.App.1986).

H.
Dorsey also challenges several other remarks made by the prosecutor.
Initially, we note that there were no objections to any of the challenged comments. Thus, we are confined to a plain-error review. Rule 45A, Ala.R.App.P.
We have thoroughly reviewed the arguments by the prosecutor and we conclude that none of the challenged comments amount to error. The comments were either based on the evidence presented at trial, comments on the strength of the State's case against Dorsey, or were the prosecutor's rendition of the evidence.
None of the comments so infected the trial with unfairness that Dorsey was denied a fair trial. See Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). Moreover, the trial court thoroughly instructed the jury on more than one occasion that the arguments of counsel were not evidence in the case.

I.
Last, Dorsey argues that the cumulative effect of the misconduct entitles him to a new trial. As we stated in McGriff v. State, [Ms. CR-97-0179, September 29, 2000] ___ So.2d ___, ___ (Ala.Crim.App.2000), quoting Minor v. State, 780 So.2d 707 (Ala.Crim.App.1999), rev'd on other grounds, 780 So.2d 796 (Ala.2000), opinion on remand, 780 So.2d 804 (Ala.Crim.App.2000):
"`Minor correctly notes that the Alabama Supreme Court has held that the cumulative effect of [prosecutorial misconduct] may warrant reversal when the individual errors alone would not. See Ex parte Tomlin, 540 So.2d 668 (Ala.1988). However, unlike Tomlin, in which the Supreme Court found several errors, we find no instances of prosecutorial misconduct that mandate reversal. "`Because we find no error in the specific instance alleged by the appellant we find no cumulative error.'" Lane v. State, 673 So.2d 825 (Ala.Cr.App.1995).... Therefore Minor's claim alleging cumulative error is without merit.'"

*509 XIII.
Dorsey argues that the trial court erred in not accepting the jury's verdict.
Dorsey was indicted for three counts of capital murder. Count I charged Dorsey with killing the three victims during the course of a robbery. Count II charged Dorsey with one count of capital murder for killing two or more persons during one scheme or pursuant to one course of conduct. Count III charged Dorsey with the capital murder of Crane, because the victim was 13 years old. The record reflects that after the jury was instructed on the offenses charged in the indictment and on the lesser offenses of felony murder, murder, and robbery, the jury recessed to deliberate and returned with a verdict. The following occurred:
"The Court: All right. What I have here is I have a felony murder of Richard Cary. I have a felony murder of Scott Williams. I have a capital murder of Timothy Bryan Crane under various counts. They have not rendered a decision as to the other two victims in Count I. They have not rendered a decision under Count 2. And they have rendered a complete decision under Count 3. Also, there is no decision under Count I as to the robbery charge.
"[Prosecutor]: Well, Judge, we think that you can ask them to go back and consider Counts I and 2 and accept the verdict in Count 3.
"[Defense counsel]: Your Honor, it would be our position that the only  (inaudible)  they either have inconsistent verdicts in that they are not completely adjudicated all issues  (inaudible)  except  I mean there  there are lesser included charges  I mean there are included charged in Count 1 and in Count 2 of the intentional murder of Timothy Bryan Crane  (inaudible)  these two back  they have been by implication indicated not guilty on those two charges, which would be inconsistent with this.
"[Prosecutor]: Well, I don't think  (inaudible)  I think we both can agree to that  on that, and the remedy is how you remedy it.
"....
"[Prosecutor]: I think there's a law  the law says the Judge can always charge jury  recharge the jury on inconsistent verdict. How far you go or what he can say, I don't know.
"[Defense counsel]: I don't think there's any question that he can go back and recharge as  as he charged them originally. I mean 
"The Court: The only way they could find felony murder under the charge that I gave them was to find the robbery did not occur.
"[Prosecutor]: Correct.
"....
"The Court: It looked to me what was happening, they decided they'd give  they'd give one felony murder on one count and one felony murder on the other count and another on the third count. That's exactly what they  they have ignored the robbery charge one way or the other.
"....
"The Court: See, we only have a problem as to Counts 1 and 2. Count 3 has been decided.
"....
"The Court: All right. Gentlemen, there are seven choices that I have written down as to what could be done in these circumstances. I thought I'd just list them for you then I'll hear what you have to say and I'll make a decision about what needs to be done.

*510 "First choice, and I'll just state this, that in my opinion, at this point, we do not have inconsistent verdicts.
"[Prosecutor]: Judge, under the caselaw you do. There's a case on point in Alabama.
"The Court: Let me see what it says.
"[Defense counsel]: Not between  Judge, I think  are you saying between the counts?
"The Court: Yeah.
"[Prosecutor]: Between the counts, we agree. One of the counts is inconsistent.
"....
"[Defense counsel]: And the only issue that we would argue is  has not been decided by the jury is whether there was that predicate felony or not, whether there was a robbery or not."
After a lengthy discussion, the trial court accepted the verdict on Count III, determined that no verdict had been returned on Count II, thereby acquitting Dorsey of this Count, and reinstructed the jury on Count I. The trial court gave the following instruction:
"The Court: Ladies and gentlemen, I cannot accept your verdict as to Count I of the indictment. You found the defendant guilty of the felony murder of Richard Cary; however, you recall that felony murder requires that a person is killed in the course of a felony. And the felony I charged you about was robbery in the first degree. Without having found the defendant guilty of robbery in the first degree, you could not find the defendant guilty of felony murder of Richard Cary.
"So, another problem under Count I of the indictment is that there were no findings with regards to the deaths of Scott Williams or Timothy Bryan Crane. And I will charge you concerning that after I deal with the felony murder question."
The jury then returned guilty verdicts on three counts of felony murder and robbery under Count I. The prosecution then objected that the guilty verdict as to the unintended murder of Crane under the felony-murder doctrine and the capital murder of Crane, which required a specific intent, were inconsistent and mutually exclusive. The trial court agreed and reinstructed the jury so that it could determine whether it intended to find Dorsey guilty of the intentional murder of Crane or the unintended murder of Crane during a felony. The jury found Dorsey guilty of the lesser to the offense of capital murder in Count I of the intentional murder of Crane.
The trial court accepted the following verdicts. Guilty of felony murder of Cary; guilty of felony murder of Williams; guilty of robbery; and guilty of capital murder of Crane because he was less than 14 years of age at the time of his murder.[11]
We note that Dorsey does not object to the fact that the trial court sent the jury back to deliberate on Count I of the indictment. Indeed, prior caselaw supports the trial court's actions. As this Court stated in Conway v. State, 489 So.2d 641, 642 (Ala.Crim.App.1986):

*511 "Here, the jury's verdicts of not guilty of kidnapping in the first degree and guilty of felony-murder were mutually exclusive because, by statutory definition, felony-murder involves causing a death during the commission or attempt to commit certain specific felonies including kidnapping in the first degree. Alabama Code 1975, § 13A-6-2(a)(3). Because of the very definition of the offenses, the defendant could not be guilty of felony-murder if he only committed kidnapping in the second degree. Conversely, if the defendant was guilty of felony-murder, he could not have been guilty of kidnapping in the second degree, but must have been guilty of kidnapping in the first degree. Consequently, the trial court properly instructed the jury and properly refused to accept the jury's original verdicts. `Nothing seems better settled than that it is the duty of the court to look after the form and substance of the verdict of the jury, so as to prevent an unintelligible or insufficient verdict from passing into the records of the court.' Martin v. State, 29 Ala.App. 395, 396, 196 So. 753, 753-54 (1940)."
See also Martin v. State, 29 Ala.App. 395, 196 So. 753 (1940) ("Here, the `verdict' sought to be returned, at first, by the jury was, manifestly, to say the least of it, an insufficient verdict. It was clearly the duty of the court to refuse to receive it."); Koonce v. State, 27 Ala.App. 46, 165 So. 601 (1936) ("It has been repeatedly held, where a verdict was not in proper form, it is proper for the court to send the jury back to put it in proper form under instructions as to the proper form."); Bentley v. State, 20 Ala.App. 635, 104 So. 679 (1925) ("`When the jury returns into court with a verdict, it is not a matter of course to receive it in the form in which it is rendered. It is the duty of the court, and of the prosecuting officer, to look after its form and substance, so far as to prevent an unintelligible, or doubtful, or an insufficient verdict from passing into the records of the court, to create embarrassments afterward and perhaps the necessity of a new trial.'"); Allen v. State, 52 Ala. 391 (1875) ("The court should require the jury, by their verdict, to pass upon the whole indictment, in such form of words as shall constitute a sufficient finding in point of law, or, if they refuse, decline altogether to accept the verdict.").
Moreover, the trial court correctly sent the jury back to deliberate on the question whether Dorsey was guilty of the intended murder of Crane or the unintended murder of Crane. As the trial court stated, a verdict of felony murder and a verdict of capital murder for the murder of the same victim are legally inconsistent.
Alabama law requires that, before an accused can be convicted of capital murder, he must have a specific intent to kill. Smith v. State, 745 So.2d 922 (Ala.Crim.App.1999). We have also held that this specific intent to kill cannot be supplied by the felony-murder doctrine. Travis v. State, 776 So.2d 819 (Ala.Crim.App.1998), aff'd, 776 So.2d 874 (Ala.2000), cert. denied, 531 U.S. 1081, 121 S.Ct. 785, 148 L.Ed.2d 681 (2001). Felony murder requires no intent to kill, but only the intent to commit the underlying felony. Mitchell v. State, 706 So.2d 787 (Ala.Crim.App.1997). Alabama's capital murder statute, § 13A-5-40, requires a specific intent to kill that is not necessary to convict for felony murder. One murder cannot be both unintended and intended.
"The general rule [in Alabama] is that there need be no rational compatibility or consistency between the verdicts on the several counts of an indictment. The exception to this rule is where the jury returns multiple convictions as to crimes *512 which are mutually exclusive of each other." Grikis v. State, 552 So.2d 187, 187 (Ala.Crim.App.1989). Because Alabama has few published cases on this issue, we have looked to other jurisdictions.
As the Illinois Court of Appeals stated in People v. Becker, 315 Ill.App.3d 980, 248 Ill.Dec. 696, 734 N.E.2d 987 (2000):
"`Legally inconsistent verdicts cannot stand because they are unreliable. At a minimum, such verdicts suggest confusion or misunderstanding on the part of the jury.' People v. Klingenberg, 172 Ill.2d 270, 281, 216 Ill.Dec. 813, 665 N.E.2d 1370 (1996). When the jury returns multiple guilty verdicts on knowing and reckless offenses for the same conduct, the verdicts are legally inconsistent, and the defendant is entitled to a new trial. People v. Hoffer, 106 Ill.2d 186, 195, 88 Ill.Dec. 20, 478 N.E.2d 335 (1985). In Hoffer, the supreme court reversed a defendant's murder and manslaughter convictions and remanded for a new trial, because the jury's multiple verdicts indicated that defendant acted in a knowing, intentional, and reckless manner for the same criminal conduct. Hoffer, 106 Ill.2d at 195, 88 Ill.Dec. 20, 478 N.E.2d 335. The court concluded that for a legally consistent verdict regarding the same criminal conduct, the jury was required to find that defendant acted either knowingly or recklessly, but that these mental states were mutually inconsistent and could not coexist. Hoffer, 106 Ill.2d at 195, 88 Ill.Dec. 20, 478 N.E.2d 335.
"In People v. Spears, 112 Ill.2d 396, 98 Ill.Dec. 9, 493 N.E.2d 1030 (1986), the supreme court expanded on Hoffer and held that where defendant's culpable conduct was essentially one act, the jury could not find that defendant possessed simultaneous knowing and reckless mental states. Spears, 112 Ill.2d at 407, 98 Ill.Dec. 9, 493 N.E.2d 1030. In that case, the defendant shot his wife and her friend within rapid succession. Five verdict forms were provided: one for attempted murder of his wife, two for armed violence as to his wife and her friend, and two for reckless conduct as to his wife and her friend. The jury found the defendant guilty on all counts. The supreme court stated that, in resolving the question of whether guilty verdicts are consistent, the charging instrument, the jury instructions and the evidence at trial provide the essential framework for analyzing the consistency of jury verdicts. Spears, 112 Ill.2d at 405, 98 Ill.Dec. 9, 493 N.E.2d 1030.
"....
"The trial court's failure to send the jury back for further deliberations to resolve the inconsistent verdicts mandates a reversal and a new trial on all the inconsistent verdicts.... We further indicate that, on retrial, the trial court should take the preventative step of instructing the jury before it deliberates that it cannot consistently return simultaneous guilty verdicts for both reckless and knowing offenses. Spears, 112 Ill.2d at 410, 98 Ill.Dec. 9, 493 N.E.2d 1030. If after deliberation the jury again returns guilty verdicts for a reckless offense and a knowing offense, the trial court must send the jury back for further deliberation with additional instructions to resolve the inconsistency. [People v.] Fornear, 176 Ill.2d [523] at 534-35, 224 Ill.Dec. 12, 680 N.E.2d 1383 [(1997)]. `When the jury return[s] with inconsistent guilty verdicts, the trial judge ha[s] a duty to send the jury back for further deliberations consistent with new instructions to resolve the inconsistency.' Spears, 112 Ill.2d at 410, 98 Ill.Dec. 9, 493 N.E.2d 1030."
*513 See also People v. Hill, 133 Ill.App.3d 644, 88 Ill.Dec. 757, 479 N.E.2d 370 (1985).
Because of the severity of the charges against Dorsey we believe that the trial court had a duty to reconcile the jury's inconsistent findings concerning Dorsey's intent. If the trial court had not, Dorsey would probably be arguing on appeal that the jury's verdict for felony murder and for capital murder of the same victim cannot stand because those verdicts are inconsistent.
Moreover, as a result of the trial court's actions, Dorsey was acquitted of the robbery-murder of Crane as charged in Count I of the indictment. When the jury returned with the lesser offense of the intentional murder of Crane under Count I, the trial court vacated this conviction because it was encompassed by the guilty verdict of capital murder in Count III. Thus, Dorsey was not convicted of any offense as a result of the trial court's sending the case to the jury a second time. Only the charge upon which a conviction rests is subject to appellate review. Gagliardi v. State, 695 So.2d 206 (Ala.Crim.App.1996).

XIV.
It has come to this Court's attention that the trial court erred in adjudicating Dorsey guilty of two counts of felony murder and the underlying offense of robbery. Dorsey was sentenced for each conviction. The underlying offense of robbery is encompassed in the two counts of felony murder. As we stated in Weaver v. State, 763 So.2d 972, 982 (Ala.Cr.App.1998), rev'd on other grounds, 763 So.2d 982 (Ala.1999), on remand, 763 So.2d 987 (Ala.Crim.App.2000):
"`For purposes of former jeopardy, the felony which provides the component necessary to elevate an intentional killing to capital murder is a lesser included offense of the capital offense. Section 13A-5-41; J. Colquitt, The Death Penalty Laws of Alabama, 33 Ala.L.Rev. 213, 254 (1982) ("In the ordinary case, lesser included offenses will include some or all lesser degrees of homicide and the lesser degrees of crimes within the definition of the aggravating component. Additionally, lesser included offenses may themselves include lesser offenses supported by the evidence."); E. Carnes, Alabama's 1981 Capital Punishment Statute, 12 Alabama Lawyer 456, 472 (1981). See also Sekou v. Blackburn, 796 F.2d 108, 110 (5th Cir.1986) ("the Double Jeopardy Clause prohibits prosecution and conviction for both felony murder and the enumerated felony.... The underlying felony is considered a lesser included offense of felony murder and thus the `same offense' for double jeopardy purposes."). Therefore, robbery is a lesser included offense of the capital offense of the capital offense involving murder-robbery.'
"Connolly v. State, 539 So.2d 436, 441 (Ala.Cr.App.1988)."
(Emphasis added).
The trial court is directed to vacate Dorsey's conviction and sentence for robbery. However, Dorsey's convictions for two counts of felony murder for the murders of Cary and Williams are valid convictions and are not affected by this decision.

XV.
Dorsey argues that the trial court erred when it denied his pretrial request that he be given notice of the aggravating circumstances on which the State intended to rely to invoke the death penalty.
Here, the only aggravating circumstance on which the State relied was charged in *514 the indictment; it was an element of the capital offense of robbery-murder. Dorsey had notice of the existence of this aggravating circumstance by virtue of the indictment.
Moreover, in regard to the other enumerated aggravating circumstances in § 13A-5-49, that are not elements of a capital offense, this Court has stated:
"The aggravating circumstances enumerated in § 13A-5-49 that may lead to the imposition of the death penalty in a capital case are not elements of the offense and are not required to be set forth in the indictment. Dobard v. State, 435 So.2d 1338, 1347 (Ala.Cr.App.1982), aff'd, 435 So.2d 1351 (Ala.1983), cert. denied, 464 U.S. 1063, 104 S.Ct. 745, 79 L.Ed.2d 203 (1984). A defendant has no right to advance notice of the state's intention to rely on any of the aggravating circumstances. Clark v. Dugger, 834 F.2d 1561, 1566 (11th Cir.1987), cert. denied, 485 U.S. 982, 108 S.Ct. 1282, 99 L.Ed.2d 493 (1988); Knotts v. State, 686 So.2d 431 (Ala.Cr.App.[1995]); Ruffin v. State, 397 So.2d 277, 282 (Fla.), cert. denied, 454 U.S. 882, 102 S.Ct. 368, 70 L.Ed.2d 194 (1981). The list of aggravating circumstances in § 13A-5-49 is exclusive and puts the defendant charged with a capital felony on notice of those circumstances against which the defendant may be required to defend. This statutory notice satisfies constitutional requirements."
Bush v. State, 695 So.2d 70, 87 (Ala.Crim.App.1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997). Cf. Arthur v. State, 711 So.2d 1031 (Ala.Crim.App.1996), aff'd, 711 So.2d 1097 (Ala.1997) (when aggravating circumstances relied on by the State are elements of the capital offense they must be charged in the indictment).

XVI.
Dorsey argues that the trial court erred in failing to give a lesser-included-offense instruction on manslaughter.
Dorsey's defense at trial was that he did not commit the murders. Defense counsel did an admirable job of casting doubt on the evidence and attacking the credibility of all of the State's witnesses and even pointing the blame for the murders on Brad Cary, the son of one of the victims.
We have traditionally held that when a requested jury instruction is inconsistent with the defense strategy there is no error in the failure to give such an instruction. See Johnson v. State, 820 So.2d 842 (Ala.Crim.App.2000); McWhorter v. State, 781 So.2d 257 (Ala.Crim.App.1999), aff'd, 781 So.2d 330 (Ala.2000); Robinson v. State, 728 So.2d 650 (Ala.Crim.App.1997); Oddo v. State, 675 So.2d 58 (Ala.Crim.App.1995).
However, in Bone v. State, 706 So.2d 1291, 1297-98 (Ala.Crim.App.1997), we noted:
"While the appellant's denial of shooting the gun does not necessarily preclude him from having a jury instruction on a lesser included offense, the absence of any evidence to support a theory of a reckless shooting does prevent him from receiving the lesser included offense instruction. In Ex parte Stork, 475 So.2d 623 (Ala.1985), the Alabama Supreme Court reviewed the issue of whether a defendant is entitled to a jury charge on a lesser included offense when he denies committing the crime itself. The Alabama Supreme Court refused to consider the defendant's testimony a bar to giving the charge, and held that a defendant is entitled to the charge on the lesser included offense as long as the charge is `based upon any material hypothesis which the evidence in his favor tends to establish.' Id. at 624. In this *515 case, there was never any evidence offered to support a theory that the shooting was the result of merely reckless conduct. Thus, there was no material basis for a theory of reckless manslaughter. The trial court did not err in refusing to charge the jury on reckless manslaughter."
In Jones v. State, 753 So.2d 1174, 1189 (Ala.Crim.App.1999), we stated:
"`Generally, a trial court should instruct the jury on a lesser offense if there is a reasonable theory from the evidence to support that lesser offense. Ex parte Stork, 475 So.2d 623 (Ala.1985). However, a trial court may properly refuse to instruct on a lesser offense when it is "clear to the judicial mind that there is no evidence tending to bring the offense within the definition of the lesser offense." Stork, 475 So.2d at 625. In this case, the trial court did not err in refusing the appellant's requested instruction on the lesser offense of manslaughter.
"`"For a jury to find that the appellant may have been guilty of manslaughter rather than murder, evidence would have had to have been introduced at trial which might have shown the appellant's conduct to have been `reckless' or triggered by `sufficient provocation.' § 13A-6-3(a), Ala.Code 1975. If such evidence is introduced `however weak, insufficient, or doubtful in credibility,' then the appellant is entitled to a jury charge on the lesser included offense. Ex parte Stork, 475 So.2d 623 (Ala.1985); Anderson v. State, 507 So.2d [580] at 583 [(Ala.Cr.App.1987)]."'
"Jones v. State, 656 So.2d 414, 415 (Ala.Cr.App.1994), quoting Carey v. State, 560 So.2d 1103, 1106 (Ala.Cr.App.1989)."
There was no evidence presented that Dorsey recklessly committed the acts charged in the indictment. Dorsey denied any involvement in the robbery and murders and attempted to place the blame on Brad Cary. Based on the evidence presented at trial we hold that the trial court did not err in refusing to instruct the jury on manslaughter.

XVII.
Dorsey argues that the trial court's jury instructions were flawed for several reasons.
When reviewing issues concerning a trial court's jury instructions, we are guided by the following principles:
"`A trial court has broad discretion when formulating its jury instructions. See Williams v. State, 611 So.2d 1119, 1123 (Ala.Cr.App.1992). When reviewing a trial court's instructions, "`the court's charge must be taken as a whole, and the portions challenged are not to be isolated therefrom or taken out of context, but rather considered together.'" Self v. State, 620 So.2d 110, 113 (Ala.Cr.App.1992) (quoting Porter v. State, 520 So.2d 235, 237 (Ala.Cr.App.1987)); see also Beard v. State, 612 So.2d 1335 (Ala.Cr.App.1992); Alexander v. State, 601 So.2d 1130 (Ala.Cr.App.1992).'"
McGriff v. State, [Ms. CR-97-0179, September 29, 2000] ___ So.2d ___, ___ (Ala.Crim.App.2000), quoting Williams v. State, 795 So.2d 753, 780 (Ala.Crim.App.1999), aff'd, 795 So.2d 785 (Ala.2001).

A.
Dorsey argues that the trial court's instruction on reasonable doubt shifted the burden of proof to him. Dorsey specifically objects to the references in the oral instruction that the jurors were to determine the true facts of the case. Before *516 giving his reasonable doubt instruction, the trial court instructed the jury on determining the facts of the case. The court gave the following instruction:
"The determination of facts does not come within my area of responsibility. It's your responsibility. It's very important in the administration of justice that the two areas of responsibility be kept separate.
"....
"Now some rules that you can use in evaluating the testimony of witnesses and other evidence. Your primary responsibility is to determine what the true facts of the case are. And in arriving at the true facts, you are directed to consider all the testimony of all the witnesses and assign what weight or importance you believe is proper to each part of the evidence in this case. You may choose to place great weight on certain parts of testimony or other evidence and little or none on other parts of the testimony and other evidence.
"....
"You are not to speculate where there is no evidence, but, if you find there is conflicting evidence, use your common sense to resolve the conflict.
"....
"Now the defendant, for his plea, and in answer to the indictment says that he is not guilty. This places upon the prosecution the burden of proving his guilt beyond a reasonable doubt. The burden never rests upon the defendant to establish his innocence nor to disprove the facts tending to establish his guilt. In regard to this I instruct you that the defendant is presumed to be innocent, and the presumption that he is innocent remains throughout the course of the trial until each and every juror is convinced, from the evidence, that the defendant is guilty beyond a reasonable doubt. This presumption of innocence is to be regarded by you as a matter of evidence, and it is a benefit to which the defendant is entitled. And only until and unless you are convinced from the evidence that the defendant is guilty beyond a reasonable doubt, only at that time does the presumption that he is innocent leave him.
"I've already explained to you that the burden is upon the State to prove the defendant guilty as charged. Before a conviction can be had in this case the Sate must satisfy each and every member of the jury of the defendant's guilt beyond a reasonable doubt. Even if the State demonstrates a probability of guilt, if it does not establish guilt beyond a reasonable doubt you must acquit the defendant.
"The phrase reasonable doubt is self explanatory. Efforts to define it do not always clarify the term, but, it may help to know that it's not a mere possible doubt. Everything relating to human affairs is open to some possible or imaginary doubt. A reasonable doubt is the doubt of a fair-minded juror honestly seeking the truth after careful and impartial consideration of all the evidence in the case. It's based upon reason and common sense. It's a doubt for which a rational explanation and a reason for having it can be given. It does not mean a vague or arbitrary notion, but, is an actual doubt based upon the evidence, a part of the evidence, the lack of evidence, a conflict in the evidence or some combination thereof. It's a doubt that remains after going over in your minds the entire case and giving consideration to all the testimony and other evidence. It's distinguished from mere possibility, bare imagination or from fanciful conjecture."
*517 (Emphasis added.) Dorsey challenges the above emphasized portion of the instruction and argues that this comment shifted the burden of proof to the defense.
However, there was no objection to this instruction; thus, we review this issue for plain error. Rule 45A, Ala.R.App.P.
It is clear after reviewing the above portion of the court's instruction that the court did not shift the burden. In fact, the trial court went out of its way to instruct the jury that the burden of proof was always with the State, and that it never shifted to Dorsey. The instructions on this issue were both thorough and accurate. No error, much less plain error, occurred here.

B.
Dorsey also argues that the trial court "denigrated" the lesser offenses by making the following comment when instructing one of the jury panels during voir dire. The record reflects that when the trial court was giving the preliminary instructions about a death-penalty case to one of the jury panels before voir dire, the trial court stated:
"The defendant  If the jury finds the defendant not guilty of a capital offense or finds the defendant guilty of a lesser included offense which is not guilty or if the jury finds him not guilty of any charge, then the jury will be discharged. If he's found guilty of a noncapital offense then he would be sentenced by the judge at a later sentencing hearing. But, if the jury finds the defendant guilty, beyond a reasonable doubt, of a capital offense, in that event, a second phase of the trial is begun called the punishment phase."
There was no objection to the above comment. We are therefore limited to determining whether there is plain error. Rule 45A, Ala.R.App.P.
Clearly, this comment was a inadvertent slip of the tongue. This remark was not in the court's final jury instructions. The trial court gave very thorough and explicit instructions on the lesser included offenses.[12]

C.
Dorsey argues that the trial court erred in its instructions on reconciling contradictory testimony of witnesses. The trial court gave the following instruction:
"You may also consider whether a witness has been contradicted, and such contradiction, if any there was, would be considered by you in determining the weight to give the testimony of that witness. Mere contradiction alone would not authorize you to disregard the testimony completely. But, should you find that a witness has testified falsely and done so intentionally, as to a material fact, then, as to that witness, you may *518 disregard his or her entire testimony if you see fit to do so. You do not have to do that, but, you may in your discretion, do so."
There was no objection to the above instruction. Therefore, we apply a plain-error standard of review. Rule 45A, Ala.R.App.P.
The appellate courts of this State have upheld substantially similar jury instructions on several occasions. See Ex parte Slaton, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997); Wilson v. State, 777 So.2d 856 (Ala.Crim.App.1999), aff'd, 777 So.2d 935 (Ala.2000), cert. denied, 531 U.S. 1097, 121 S.Ct. 826, 148 L.Ed.2d 709 (2001); Smith v. State, 756 So.2d 892 (Ala.Crim.App.1998), aff'd, 756 So.2d 957 (Ala.), cert. denied, 531 U.S. 830, 121 S.Ct. 82, 148 L.Ed.2d 44 (2000); Freeman v. State, 722 So.2d 806 (Ala.Crim.App.1998).

D.
Dorsey argues that the trial court erred in instructing the jury on the weight to give Dorsey's statement. He contends that this instruction should not have been given because he did not make a statement to police.
There was no objection to this instruction; thus, we look only for plain error. Rule 45A, Ala.R.App.P.
The record reflects that Middleton and Brooks testified as to many statements Dorsey made concerning the planning and execution of the robbery-murders. Moreover, during this jury instruction the trial court prefaced the instruction by stating, "the alleged confession or statement." Clearly, this instruction was based on evidence presented at trial. The trial court did not abuse its discretion in giving this instruction. See McGriff, supra.

E.
Dorsey argues that it was error for the trial court to use examples from the facts of the case during its instructions.
There was no objection to this instruction; therefore, we look only for plain error. Rule 45A, Ala.R.App.P.
During the trial court's explanation of aiding and abetting, it gave examples to clarify the instruction to the jurors. One example stated:
"Take, for example, robbery in the first degree. If you find that a robbery in the first degree or an attempt thereof of Richard Cary was committed by some person other than the defendant, the defendant is guilty of that robbery in the first degree or an attempt thereof if you find, beyond a reasonable doubt, either that the defendant intentionally procured, induced or caused the other person or persons to commit the robbery in the first degree or an attempt thereof or that the defendant intentionally aided or abetted another person in committing the robbery in the first degree or an attempt thereof."
We have approved of a trial court's use of examples in a jury instruction to clarify a difficult legal concept. See Brannon v. State, 549 So.2d 532 (Ala.Crim.App.1989).

F.
Dorsey argues that the trial court erred in failing to give many of his requested jury instructions. In his brief to this Court, Dorsey makes the following argument, "For example, requested jury charges, # 1, 2, 3, 5, 16, 18, 19, 20, 22, 23, 26, 36, 37 defined and clarified the reasonable doubt burden placed on the state. As such, they were a correct statements of the law, and the jury should have been so instructed."
*519 While we do not condone the brevity of Dorsey's argument on this issue  an argument that fails to cite to specific instructions or any reason why these instructions should have been given  we will review Dorsey's assertions because this is a death-penalty case.
Dorsey's only objection at trial was that the instructions were correct statements of the law. This objection is not specific and fails to preserve an issue for appellate review. Hardeman v. State, 651 So.2d 59, 63 (Ala.Crim.App.1994). Therefore, we are limited to determining whether refusing those instructions was plain error. Rule 45A, Ala.R.App.P.
We have reviewed the requested jury instructions and the trial court's instructions. All of the requested instructions now challenged on appeal were adequately covered in the trial court's very thorough jury charge. "If a requested charge that would be a proper instruction is covered in the oral charge or by the given requested charges, then its refusal does not constitute error." Ex parte Wilhite, 485 So.2d 787 (Ala.1986).

XVIII.
Dorsey argues that Alabama's § 13A-5-40(a)(15), Ala.Code 1975, is unconstitutional because it makes all intentional killings of individuals under the age of 14 a capital offense. He asserts that this statute is arbitrary and capricious and subjects him to the death penalty solely on the basis of a "mutable characteristic of the victim," which has no rational basis.
This issue has been previously addressed and decided adversely to Dorsey. As this Court stated in MacEwan v. State, 701 So.2d 66, 71 (Ala.Crim.App.1997):
"MacEwan argues that the statute under which she was convicted, § 13A-5-40(a)(15), Ala.Code 1975, is unconstitutional because it, she says, `creates an arbitrary classification which is not rationally related to a legislative purpose.' MacEwan cites no authority to support her argument. The statute in question classifies as a capital offense a murder when the victim is less than 14 years of age. We find the argument to be without merit.
"This Court, in Ex parte Woodard, 631 So.2d 1065 (Ala.Cr.App.1993), cert. denied, 662 So.2d 929 (Ala.), cert. denied, 513 U.S. 869, 115 S.Ct. 190, 130 L.Ed.2d 123 (1994), has previously upheld the constitutionally of the statute in question against an identical challenge. In determining that § 13A-5-40(a)(15) was rationally related to the legislature's goal of providing special protection for those people who are at an age at which public policy has concluded they may not be responsible for their own acts (below age 14), this Court wrote:
"`"`Because the statute does not proscribe activities that are legally protected and does not involve any legally cognizable "suspect" class, "the classification [of child-murder] must be upheld if `any of the facts rationally justifying it is demonstrated to or perceived by the court.'"'"'
"Woodard, 631 So.2d at 1073, quoting Hardy v. State, 576 So.2d 685, 685 (Ala.Cr.App.1991) (citations omitted).
"Based on the above, we again hold that § 13A-5-40(a)(15) is not unconstitutionally arbitrary."

XIX.
Dorsey argues that the evidence was insufficient to convict him. He cites two different reasons in support of this contention.

*520 A.
Dorsey first argues that there was not sufficient evidence to corroborate his accomplice's testimony. We do not agree.
Section 12-21-222 provides:
"A conviction of felony cannot be had on the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the commission of the offense, and such corroborative evidence, if it merely shows the commission of the offense or the circumstances thereof, is not sufficient."
As our Supreme Court has stated concerning the application of this statute:
"`The test for determining the sufficiency of evidence corroborating the testimony of an accomplice is based on a subtraction process. The accomplice testimony must be eliminated, and then if, upon examination of all other evidence, there is sufficient evidence tending to connect the defendant with the commission of the offense, there is sufficient corroboration. Corroborative evidence need not be strong, and need not be sufficient in and of itself to support a conviction; it need not directly connect the accused with the crime, but only tend to do so. Circumstantial evidence is sufficient to show such corroboration.'"
Ex parte Hardley, 766 So.2d 154 (Ala.1999), on remand, 766 So.2d 158 (Ala.Crim.App.2000), quoting Goodwin v. State, 644 So.2d 1269, 1274-75 (Ala.Crim.App.1993).
Brooks testified that on November 20, 1996, he saw Dorsey and Middleton and that Dorsey asked him if he wanted to accompany them to "hit a store" in Brooklyn. Brooks was also with the two when they stopped at Dorsey's house that evening. Dorsey came back to the car carrying a duffel bag and a revolver. Brooks also said that he saw the two later that night at a club in Opp and that Middleton told him that they had "pulled some 187s."
A fellow inmate of Dorsey's in the Escambia County Jail also testified that Dorsey told him that Middleton and he had been involved in a robbery that had "gone bad" and that he had shot a boy and that Middleton had shot one of the men with a shotgun.
Money and a gun were also discovered near the road leading to the store  an area consistent with where Middleton testified the two parked their vehicle.
There was sufficient evidence to corroborate Middleton's testimony.

B.
Dorsey also argues that there was not sufficient evidence to convict him for the capital murder of Crane because, he says, there was no evidence of his intent to kill Crane.
Section 13A-5-40(a)(15), Ala.Code 1975, makes the intentional murder of a victim who is less than 14 years of age a capital offense. To be convicted of this offense an accused must have the specific intent to kill and the individual killed must be less than 14 years of age.
Sarah Crane, Bryan Crane's mother, testified and introduced into evidence a copy of Bryan's birth certificate. The birth certificate showed that Bryan was born on April 15, 1983. He was murdered on November 20, 1996  he was 13 years old at the time of his murder.
Middleton testified that when Dorsey got back to the car after the robbery-murders he told him that he had shot Williams and then shot Crane because he had tried to run. Also, Jordan testified that Dorsey told him that he had pointed the gun at Crane, had closed his eyes, and had shot him. Moreover, in preparation *521 for the robbery the two had obtained two guns from Dorsey's house.
"The question of whether a defendant intentionally caused the death of another person is a question of fact for the jury. Carr v. State, 551 So.2d 1169 (Ala.Cr.App.1989)." Ex parte Carroll, 627 So.2d 874 (Ala.1993), cert. denied, 510 U.S. 1171, 114 S.Ct. 1207, 127 L.Ed.2d 554 (1994). "The question of intent is hardly ever capable of direct proof. Such a question is normally a question for the jury. Loper v. State, 469 So.2d 707 (Ala.Cr.App.1985)." Lucas v. State, 792 So.2d 1161, 1168 (Ala.Crim.App.1999), rev'd on other grounds, 792 So.2d 1169 (Ala.2000), on remand, 792 So.2d 1175 (Ala.Crim.App.2001).
There was sufficient evidence to present the question to the jury as to whether had the specific intent to kill Crane.

XX.
Dorsey argues that the trial court bestowed heightened authority on the foreman of the petit jury by instructing the jury that the foreman was to moderate their discussions and return the verdicts.
There was no objection to this instruction; thus, we apply a plain-error standard of review. Rule 45A, Ala.R.App.P.
This same issue was addressed in Maples v. State, 758 So.2d 1 (Ala.Crim.App.), aff'd, 758 So.2d 81 (Ala.1999), cert. denied, 531 U.S. 830, 121 S.Ct. 83, 148 L.Ed.2d 45 (2000). In Maples, the trial court instructed the jury that the first order of business was to appoint a foreperson and that this person would moderate the deliberations of the jury and act as its spokesperson. This Court, noting that the trial court emphasized the role of each juror's opinion, found that there was not plain error. We also noted that the duties on which the trial court instructed the jury are the same duties as the foreperson of a grand jury. The Alabama Supreme Court has characterized the duties of a grand jury foreperson as "merely ministerial." See Pace v. State, 714 So.2d 332 (Ala.1997), on remand, 714 So.2d 340 (Ala.Cr.App.), cert. denied, 523 U.S. 1051, 118 S.Ct. 1372, 140 L.Ed.2d 520 (1998).
Based on our holding in Maples we find no error. The trial court emphasized that the jury's verdict had to be unanimous. The trial court did not bestow heightened authority on the foreperson.

XXI.
Dorsey argues that his guilty verdict was unreliable and unconstitutional because the trial court had the jury begin deliberations at 7:52 p.m. He asserts in his brief to this Court that, by having the jury begin deliberations at this hour, the court "created a coercive and intimidating atmosphere."
There was no objection to the trial court's submitting the case to the jury at this hour. Therefore, we look for plain error. Rule 45A, Ala.R.App.P.
A trial court has broad discretion in scheduling cases. As we have stated:
"`The trial court has discretion in scheduling a trial and in determining courtroom procedure as long as the exercise of that discretion does not result in the denial of a defendant's basic constitutional right. Ephraim v. State, 627 So.2d 1102, 1105 (Ala.Cr.App.1993)'
"Hyde v. State, 778 So.2d [199,] at 236.
"`"The duration of deliberations by the jury is committed to the sound discretion of the trial court. The exercise of that discretion will not be disturbed on appeal except for clear abuse. Martin v. State, 29 Ala.App. *522 395, 396, 196 So. 753 (1940)." Hammons v. State, 371 So.2d 986 (Ala.Cr.App.1979).'
"Thomas v. State, 399 So.2d 915, 923 (Ala.Cr.App.1981)."
Griffin v. State, 790 So.2d 267, 317 (Ala.Crim.App.1999).
The record reflects that the following occurred:
"The Court: All right. If you would, bring the jury.
"(Whereupon, the jury returned to the presence and hearing of the courtroom at 9:00 p.m. on the 19th day of February, 1998, following which the following occurred, to-wit.)
"The Court: Mr. Foreman, without revealing the state of your deliberations. I wanted to ask you if you are close to a verdict?
"The Foreman: No, sir.
"The Court: All right. At this time, we're going to take a recess for the evening and let you go to the motel and spend the night and come back at nine o'clock in the morning."
The record shows that the trial court did not coerce the jury to return a verdict but, in fact, recessed court for the night because the foreman indicated that the jurors had not reached a verdict. There is no evidence that the trial court's actions prejudiced Dorsey in any way.

XXII.
Dorsey argues that Alabama's statute limiting court-appointed attorney fees to $1,000 for out-of-court work in a capital case violates the separation-of-powers doctrine, constitutes a taking without just compensation, and violates the Equal Protection Clause of the United States Constitution.
"The Alabama Supreme Court has rejected these arguments. See Ex parte Grayson, 479 So.2d 76 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157 (1985), and Sparks v. Parker, 368 So.2d 528 (Ala.), appeal dismissed, 444 U.S. 803, 100 S.Ct. 22, 62 L.Ed.2d 16 (1979)." Johnson v. State, 820 So.2d 842 (Ala.Crim.App.2000).
We note that the Alabama Legislature recently amended § 15-12-21, Ala.Code 1975, to increase the attorney fees for all court-appointed attorneys. As of June 10, 1999, there is no maximum on the amount an attorney appointed to represent an indigent in a capital case.

Penalty-Phase Issues

XXIII.
It has come to this Court's attention that the trial court's order sentencing Dorsey to death is deficient for two reasons.
Initially, the trial court indicated that it found that there were nonstatutory mitigating circumstances that were entitled to moderate weight but it did not identify those nonstatutory mitigating circumstances. The trial court stated in its order:
"The Court has considered, pursuant to § 13A-5-52, Code of Alabama, 1975, the circumstances of the crime.
"The Court has considered those matters presented during the sentencing hearing held on this date, the arguments of counsel, and has considered the presentence report filed by the probation officer and admitted into evidence during the sentencing hearing on this date, and the response of the Defendant to the courts allocution.
"....
"The Court finds that the mitigating circumstances adduced pursuant to § 13A-5-52, Code of Alabama, 1975, are entitled to moderate weight."
*523 We must know what evidence the trial court found to be nonstatutory mitigating circumstances so that we can assess the validity of the trial court's sentence of death. See Hodges v. State, 856 So.2d 875 (Ala.Crim.App.2001).
This case must be remanded for the trial court to correct its sentencing order to specifically designate the evidence it found to present nonstatutory mitigating circumstances.
Also, the jury recommended, by a vote of 11 to 1, that Dorsey be sentenced to life imprisonment without the possibility of parole. The Alabama Supreme Court recently, in Taylor v. State, 808 So.2d 1215 (Ala.2001), stated that a trial judge must make specific findings as to why he gave the jury's recommendation the consideration he gave it. Here, the trial judge stated only that he had considered the recommendation of the jury. The trial court must state its reasons for giving the jury's recommendation the consideration that it did. See Taylor. Recently, the Alabama Supreme Court in Ex parte Apicella, 809 So.2d 865 (Ala.2001), upheld § 13A-5-47(e), which allows a trial judge to disregard a jury's verdict and to sentence a defendant to death, against constitutional attack.
We pretermit discussion of the remaining issues pending the resubmission of this case after remand.
For the reasons stated above, this case is remanded to the Circuit Court for Conecuh County for that Court to vacate Dorsey's conviction and sentence for robbery, as discussed in Part XIV of this opinion and for the trial court to correct its sentencing order to state the nonstatutory mitigating circumstances that it found to exist and to state the reasons why he gave the jury's recommendation the consideration that he did.
Due return should be filed in this Court no later than 45 days from the date of this opinion.
REMANDED WITH DIRECTIONS.
COBB, BASCHAB, SHAW, and WISE, JJ., concur.[13]

On Return to Remand
McMILLAN, Presiding Judge.
The appellant, Ethan Eugene Dorsey, was convicted of one count of capital murder for murdering Timothy Bryan Crane, a 13-year-old, and two counts of felony-murder for the deaths of Richard Cary and Scott Williams during a robbery. The trial court sentenced Dorsey to death on the capital-murder conviction and to consecutive terms of life imprisonment on the felony-murder convictions. We remanded this case for the trial court to vacate Dorsey's conviction for robbery, because that offense was encompassed in the felony-murder convictions, and for the trial court to correct its sentencing order. See Dorsey v. State, 881 So.2d 460 (Ala.Crim.App.2001).
The trial court has complied with our directions and has submitted its return to this Court. We now address the issues concerning the penalty phase of Dorsey's capital trial. We note that our remand of this case for the trial court to correct its sentencing order has rendered several of Dorsey's claims moot.

I.
Dorsey argues that the trial court erred in scheduling the sentencing hearing before the trial court, as provided in § 13A-5-47(c), Ala.Code, 1975, five days after *524 Dorsey was convicted and the jury had made its recommendation. He asserts that five days was not sufficient time for the presentence report to be prepared.
The following occurred when the scheduling of the sentencing hearing was discussed in the record:
"The Court: Gentlemen, I was thinking that February 26, next Thursday, would be an appropriate time to do a sentencing hearing.
"Mr. King [defense counsel]: Judge, we'll make time to be here. And I  I don't have a calendar here, but, I 
"Mr. Chapman [prosecutor]: I don't either, but, I don't  don't think there's a problem.
"The Court: That's next Thursday.
"Mr. King: Is that going to give the probation officer enough time?
"The Court: I think it will because I'm going to instruct him to go ahead and complete it.
"Mr. Hyde [prosecutor]: We'll be  we'll be prepared, Judge, for the hearing.
"The Court: All right.
"Mr. Chapman: All right.
"The Court: That's a good idea. Ten o'clock."
Initially, it appears from the above dialogue that all parties agreed on the date for the sentencing hearing; therefore, any error in setting that date must amount to plain error." `An invited error is waived, unless it rises to the level of plain error.'" Williams v. State, 710 So.2d 1276, 1316 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.1997), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 (1998), (quoting Ex parte Bankhead, 585 So.2d 112, 126 (Ala.1991)).
Dorsey specifically argues that the presentence report was incomplete because of the following statement contained in the report, "time constraints and the fact that Dorsey does not live locally did not permit an in depth survey of his community reputation." However, Dorsey fails to cite the entire portion of this section of the presentence report. This section read as follows:
"Time constraints and the fact that Dorsey does not live locally did not permit an in depth survey of his community reputation. However, one source contacted by telephone stated that, during the time they were associated with Dorsey, he was a fine young man doing great things. He was doing well in school and, as far as they knew, he was never a problem. They indicated that, when he was accused of the present offense, they found it hard to believe."
We have reviewed the presentence report. It is both thorough and complete. It contains extensive background information on Dorsey. There is absolutely no evidence indicating that the report was compiled years before the sentencing date as was the situation this Court condemned in Guthrie v. State, 689 So.2d 935 (Ala.Crim.App.1996), and relied on by Dorsey in his brief to this Court, or that the report failed to contain any mitigating evidence. Neither has Dorsey pointed this Court to any allegedly mitigation evidence that was omitted from the report.
Moreover, the trial court found in its amended sentencing order that Dorsey's reputation in the community was a nonstatutory mitigating circumstance.
It is relevant to this discussion that we point out that Dorsey, after an extensive colloquy with the trial court, waived his right to present any mitigating evidence during the sentencing hearing. There is absolutely no evidence tending to show that Dorsey was prejudiced by the fact that the sentencing hearing before the trial court was scheduled only five days after *525 the jury returned its verdict. We have often noted that it is within the trial judge's discretion to schedule his or her court calendar. See Ephraim v. State, 627 So.2d 1102, 1105 (Ala.Crim.App.1993). There was absolutely no abuse of that discretion here. Nor is there any plain error.

II.
Dorsey argues that the trial court forced him to reveal his closing argument during the penalty phase, thereby relinquishing his right to personally address the jury during closing arguments. The following occurred:
"Mr. King: ... [Dorsey] does not want to release us as his attorneys. We are continuing to represent him. He wants to participate in  in his defense and assist in giving closing argument is what he wants to do. He does not want to do away with us and do that on his own. He wants to be able to give a portion of his closing argument. Him and Mr. Weaver would then do that.
"I've had marked as Defense Exhibit 24, for identification purposes, a statement that we're  we're asking to offer at sentencing. If the Court wants, Your Honor, we can offer it in front of the jury and you can rule then or rule now. It's up to the Court.
"And if the Court wants, I think he's going to write out what he wants to say in closing. If the Court wants to review that ahead of time, we'd be glad to let you do that.

"....
"The Court: What exactly do you expect him to testify to?"
(Emphasis added.)
There was no objection made to the above exchange; therefore, we review the issue for plain error. Rule 45A, Ala.R.App.P.
The above dialogue shows that Dorsey volunteered to show the trial court a statement that he wanted to read to the jury during closing arguments in the penalty phase. The trial court did not violate any of Dorsey's rights nor force him to reveal the substance of his closing argument. The trial court correctly told Dorsey that if he chose to make a statement to the jury he would be subject to the prosecutor's objecting to any objectionable remarks. It is clear that Dorsey voluntarily relinquished his right to make a statement to the jury. There is no plain error here.

III.
Dorsey argues that it was a violation of the Double Jeopardy Clause to use a felony as to which he had been acquitted as an aggravating circumstance. Dorsey argues that the jury acquitted him of robbery and that, therefore, the trial court could not use robbery as an aggravating circumstance.
In Part XIII of our original opinion we specifically held that Dorsey was not acquitted of robbery. We held that the trial court correctly accepted verdicts for felony-murder, with the underlying felony being robbery, and capital murder. Dorsey was not acquitted of robbery; therefore, robbery could form the basis for the application of this aggravating circumstance. No error occurred here.

IV.
Dorsey argues that Alabama's method of execution, the electric chair, results in cruel and unusual punishment in violation of the United States Constitution and the Alabama Constitution.
"It is well settled that death by electrocution does not constitute cruel and *526 unusual punishment in violation of the Eighth Amendment. See Lindsey v. Smith, 820 F.2d 1137 (11th Cir.1987), cert. denied, 489 U.S. 1059, 109 S.Ct. 1327, 103 L.Ed.2d 595 (1989); Sullivan v. Dugger, 721 F.2d 719 (11th Cir.1983); Lowenfield v. Phelps, 817 F.2d 285 (5th Cir.1987), aff'd, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988); Stephens v. State, 580 So.2d 11 (Ala.Cr.App.1990), aff'd, 580 So.2d 26 (Ala.), cert. denied, 502 U.S. 859, 112 S.Ct. 176, 116 L.Ed.2d 138 (1991); Thompson v. State, 542 So.2d 1286 (Ala.Cr.App.1988), aff'd, 542 So.2d 1300 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989); Jackson v. State, 516 So.2d 726 (Ala.Cr.App.1985), remanded on other grounds, 516 So.2d 768 (Ala.1986).
"Moreover Bryant's claims that Alabama's electric chair is antiquated and inadequate and that it results in prolonged and torturous executions have been previously addressed and decided adversely to him. See Thomas v. Jones, 742 F.Supp. 598, 602 (S.D.Ala.1990); Ritter v. Smith, 568 F.Supp. 1499 (S.D.Ala.1983), aff'd. in relevant part, rev'd in unrelated part, 726 F.2d 1505, 1519 (11th Cir.), cert. denied, 469 U.S. 869, 105 S.Ct. 218, 83 L.Ed.2d 148 (1984); McNair v. State, 706 So.2d 828 (Ala.Cr.App.1997), cert. denied, 523 U.S. 1064, 118 S.Ct. 1396, 140 L.Ed.2d 654 (1998); Jackson, 516 So.2d at 738."
Bryant v. State, [Ms. CR-98-0023, November 19, 1999] ___ So.2d ___, ___ (Ala.Crim.App.1999).

V.
Dorsey argues that the prosecutor improperly urged the trial court to sentence him to death because he showed no remorse for the crimes.
The complained-of comment occurred in the closing argument at the sentencing hearing before the trial court, not at the sentencing hearing before the jury. "Trial judges are presumed ... to know the law and to follow it in making their decisions." Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 680 (1997). "Moreover, remorse is ... a proper subject of closing arguments." Ex parte Loggins, 771 So.2d 1093, 1101-02 (Ala.2000), citing Dobyne v. State, 672 So.2d 1319, 1348-49 (Ala.Crim.App.), on remand, 672 So.2d 1353 (Ala.Crim.App.1994), aff'd, 672 So.2d 1354 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996).

VI.
Dorsey argues that the trial court's instructions to the jury on weighing the mitigating circumstances and the aggravating circumstance were erroneous.
There was no objection to the trial court's jury instructions; therefore, we look for only plain error. See Rule 45A, Ala.R.App.P.
The trial court's jury instructions on weighing the mitigating circumstances and the aggravating circumstance were both thorough and accurate. The trial court gave the following instruction, in part:
"The process of weighing aggravating and mitigating circumstances against each other in order to determine the proper punishment is not a mechanical process. Your weighing of the circumstances against each other should not consist totally of adding up the total number of aggravating circumstances and comparing that number to the total number of mitigating circumstances.
"The law of this State recognizes that it is possible, at least in some situations, that one or a few aggravating circumstances *527 may outweigh a larger number of mitigating circumstances. And the law of this State also recognizes that it's possible, at least in some situations, that a large number of aggravating circumstances might be outweighed by one or more  one or fewer mitigating circumstances.
"In other words, the law contemplates that different circumstances may be given different weights or values in determining the sentence in light of all the other circumstances in this case. You must do that in the process of weighing the aggravating circumstances against the mitigating circumstances."
The instructions were consistent with the law as set out in § 13A-5-48, Ala.Code 1975.
Furthermore, any conceivable error was rendered harmless by the jury's recommendation. "Any error that may have occurred is harmless because the jury recommended life imprisonment without parole." Rieber v. State, 663 So.2d 985, 993 (Ala.Crim.App.1994), aff'd, 663 So.2d 999 (Ala.), cert. denied, 516 U.S. 995, 116 S.Ct. 531, 133 L.Ed.2d 437 (1995), citing Giles v. State, 632 So.2d 568 (Ala.Crim.App.1992), aff'd, 632 So.2d 577 (Ala.1993), cert. denied, 512 U.S. 1213, 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994).

VII.
Dorsey argues that the trial court considered irrelevant and immaterial evidence when it overrode the jury's recommendation. During the sentencing hearing before the trial court, the following occurred:
"The Court: All right. During this hearing you have an opportunity to offer some evidence regarding the circumstances of the crime. There were six things that I was concerned about. The first thing was is there any evidence as to the type shotgun used, not the gauge so much as to whether or not it was a single shot, a pump, a double barrel or whatever? Second, I am going to listen to a replay of Mr. Jordan's testimony. Third, I'd like to look at some of the photo exhibits that were admitted during the guilt phase. Fourth, was the autopsy admitted of Timothy Bryan Crane?
"Mr. Chapman: Didn't offer the autopsy itself, no, sir.
"The Court: I would like to know if at the scene or in the autopsy there was any significant amount of blood found on the back of his head. That might ultimately be found in any emergency-room notes. Fifth, I'd like to know about the access of Mr. Jordan to news reports; particularly, I'd like to know if he had access to news reports which reported that the two defendants traveled toward Brewton to the Boykin area and put guns in the woods. Sixth, I would like to see the statement of Jordan. I'd like to know how it was taken, whether or not there was leading questions asked or a free flow of information without suggestive questions, especially as to the trip and putting guns in the woods. And my seventh question, which I've just written down was whether or not that was a felony or not. And I've discovered it was not.
"....
"The Court: All right. Like I say, I will give both the State and the defense any opportunity they wish to develop any information they feel like is to their advantage regarding those circumstances. And they particularly concern the circumstances of the crime and the defendant's participation in it. I know that these things I'm asking were not in the guilt phase of the trial because I took extensive written notes about all of *528 that and  and those were things that came up when I was preparing my  my summary. And I just wanted to determine with a little bit more detail since we have a little bit more latitude in sentencing hearing, whether or not any mitigating circumstances arose out of those particular areas.
"....
"The Court: All right. Let me note for the record that I have looked at the statement of Windell Jordan [jail-house witness] solely for the purpose of discovering inconsistencies which would lead to mitigating circumstances under § 13A-5-52 and found nothing that would establish a mitigating circumstance."
Initially, we observe that there was no objection to the above exchange. Therefore, we apply only a plain-error analysis. Rule 45A, Ala.R.App.P.
It is clear from the above dialogue that the trial court did not consider any irrelevant evidence. The trial court went out of its way to try to find any conceivable mitigating evidence to warrant lenience in the case. There was no error, much less any plain error.

VIII.
Last, as required by § 13A-5-53, Ala.Code 1975, we will address the propriety of Dorsey's conviction for capital murder and his sentence to death by electrocution. Dorsey was indicted for three counts of capital murder for murdering Richard Cary, Scott Williams, and Timothy Bryan Crane during the course of a robbery, one count of capital murder for murdering two or more people during one course of conduct, and one count of capital murder for murdering an individual who was under 14 years of age. The jury convicted Dorsey of the lesser offenses of felony murder for the murder of Cary and Williams and of capital murder for killing Crane. The jury recommended by a vote of 11 to 1 that Dorsey be sentenced to life imprisonment without the possibility of parole. The trial court chose not to follow the jury's recommendation and sentenced Dorsey to death by electrocution for the capital-murder conviction.
Dorsey argues that it was impermissible for the trial court to sentence him to death when the jury had recommended a sentence of life imprisonment without parole. Specifically, he argues, "Alabama is the only state in the country which permits the trial court to reject a jury's capital sentencing verdict without reference to any standard or norm." He asserts that judicial override is arbitrary and capricious and that there is no standard of review for determining whether an override is appropriate in a given case.
All of Dorsey's arguments were addressed by the Alabama Supreme Court in Ex parte Taylor, 808 So.2d 1215 (Ala.2001), and determined adversely to Dorsey. The Taylor Court stated:
"This Court held in Ex parte Jones, 456 So.2d 380 (Ala.1984), that the Constitution of the United States does not require the `[adoption of] specific limitations on the trial court's power to override the jury's advisory verdict' and that Alabama's capital-sentencing procedure provides sufficient protection for capital defendants because `[t]he whole catalog of aggravating circumstances must outweigh mitigating circumstances before a trial court may opt to impose the death penalty by overriding the jury's recommendation' of life imprisonment. 456 So.2d at 382. Under Alabama's capital-sentencing procedure, the trial judge must make specific written findings regarding the existence or nonexistence of each aggravating circumstance and each *529 mitigating circumstance offered by the parties. § 13A-5-47(d), Ala.Code 1975. In making these findings, the trial judge must consider a jury's recommendation of life imprisonment without parole. See § 13A-5-47(e), Ala.Code 1975 (`in [weighing the aggravating and mitigating circumstances] the trial court shall consider the recommendation of the jury contained in its advisory verdict'). Construing subsection (e) together with subsection (d), we conclude that the trial judge must state specific reasons for giving the jury's recommendation the consideration he gave it. McCausland v. Tide-Mayflower Moving & Storage, 499 So.2d 1378, 1382 (Ala.1986) (stating that subsections of a statute `should be construed together to ascertain the meaning and intent of each'). Therefore, we hold that Alabama's capital-sentencing procedure does not result in the imposition of the death sentence in an arbitrary and capricious manner in violation of the Fourteenth Amendment.
"....
"Taylor also argues that there is no standard of appellate review for determining whether a trial judge's override of the jury's recommendation is appropriate in a particular case. We disagree. Section 13A-5-53(a), a part of Alabama's capital-sentencing procedure, provides that the Court of Criminal Appeals must `review the propriety of the death sentence,' and in doing so must `[determine] whether any error adversely affecting the rights of the defendant was made in the sentence proceedings, whether the trial court's findings concerning the aggravating and mitigating circumstances were supported by the evidence, and whether death was the proper sentence in the case.' Subsections 13A-5-53(b) and (c) require that `[i]n determining whether death was the proper sentence,' the Court of Criminal Appeals `shall explicitly address' the following three questions:
"`(1) Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor;
"`(2)whether an independent weighing of the aggravating and mitigating circumstances at the appellate level indicates that death was the proper sentence; and
"`(3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.'
"§ 13A-5-53(b) and (c), Ala.Code 1975. Thus, in determining whether the trial court's sentence of death was improper, the Court of Criminal Appeals must independently weigh the aggravating and mitigating circumstances and consider the jury's advisory verdict."
808 So.2d at 1219-20 (footnote omitted).
Here, the trial court chose not to follow the jury's recommendation and stated the following reasons in its amended order:
"The Court has also considered and given appropriate weight to the advisory verdict of the jury recommending life imprisonment without parole. The Court has given little weight to the recommendation of the jury and hereby sets forth the following reasons for this weighing:
"(a) The jury was confused during its deliberations in the guilt phase of the trial and had to be instructed twice after this court's original charge because it returned inconsistent verdicts which were not logically defensible.
"(b) The jury appeared confused during this court's subsequent instructions as shown by the expressions on their faces when the court labored to explain *530 the difference between capital murder and felony murder.
"(c) All of the evidence adduced at trial proved that the murder of Timothy Bryan Crane occurred during a robbery. There was no evidence at all which was contrary to this conclusion. The jury found that Robbery in the First Degree had occurred because all of the elements of Robbery in the First Degree are a part of the definition of felony murder. The murders of all three victims were a part of a continuous transaction. That transaction was a robbery.
"The definition of capital murder set out in § 13A-5-40 provides that:
"(a) The following are capital offenses:
"(2) Murder by the defendant during a robbery in the first degree or an attempt thereof committed by the defendant
"The definition of Robbery in the First Degree includes the following definition from § 13A-8-40(b) " `In the course of committing a theft' embraces acts which occur in an attempt to commit or the commission of theft, or in immediate flight after the attempt or commission.
"In finding the defendant guilty of the capital murder of Timothy Bryan Crane in Count III, the jury found that the Defendant had intentionally murdered him.
"Considering all guilt phase verdicts finally accepted by this court, the jury found that there was a robbery and that Timothy Bryan Crane was intentionally murdered at that time. All of the evidence conclusively proved that the death of Timothy Bryan Crane was during a robbery as [the offense] was defined to the jury during the court's instructions. The failure of the jury to find that the death of Timothy Bryan Crane was a capital offense under Count I of the indictment, charging intentional murder committed during a robbery, is an indication that the jury compromised during deliberations. The jury further found during the penalty phase of the trial that the aggravating circumstance set out in § 13A-5-49(4) did occur. This section provides:
"The capital offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, or flight after committing, or attempting to commit,... robbery
"This court cannot speculate as to the jury's motives or thoughts, however the court has considered this result and found that it causes the subsequent recommendation of the jury to be accorded less weight than would be given to a jury verdict which was consistent and logical.
"(e) The jury [members] appeared with their suitcases on the morning of the second day of deliberations. They had not been instructed that the case would be over on that day. The suitcases had to be stored in the trial judge's office. That day they returned their verdicts. When the court instructed the jury that a penalty phase was to begin following the reception of the capital-murder verdict in the case, many members of the jury showed shock and dismay on their faces. The jury had been previously instructed during the jury selection phase of the trial that a penalty phase would begin if a capital verdict was returned. This court has to conclude that the jury was impatient to return home after having been sequestered."
The trial court's characterization of the jury is supported by the record. The jury was out only 10 minutes before it returned *531 with a recommendation of life imprisonment without parole. Moreover, the trial court's findings are sufficient to comply with the Alabama Supreme Court's decision in Ex parte Taylor, supra.
The trial court found that the aggravating circumstance outweighed the mitigating circumstances and sentenced Dorsey to death. The trial court found as statutory mitigating evidence that Dorsey had no significant history of prior criminal activity. See § 13A-5-51(1). The trial court found the following nonstatutory mitigating circumstances:
"(a) That there was no evidence that the defendant planned to kill the persons found to be inside the grocery store of Richard Cary. This circumstance is based on the evidence adduced during the guilt phase of the case.
"(b) That the Defendant's accomplice was the person who fired the first shot, and precipitated the killing spree, not the Defendant himself. This circumstance is based on the evidence adduced during the guilt phase of the case.
"(c) That the murder of Scott Williams appeared to be a result of a struggle for control of the .357 pistol and did not appear to be an intentional killing. The jury found this to be an unintentional act as shown by the verdict finding the defendant guilty of Felony Murder. This circumstance is based on the evidence adduced during the guilt phase of the case.
"(d) The defendant has graduated from high school and has attended college. This circumstance is based on the pre-sentence report.
"(e) He had enjoyed a good reputation with some people in the past. This circumstance is based on the pre-sentence report.
"(f) The defendant served his country by joining the Army Reserve and was discharged under honorable conditions after suffering injuries in an automobile accident. This circumstance is based on the pre-sentence report.
"The Court find[s] that these mitigating circumstances adduced pursuant to § 13A-5-52, Code of Alabama, 1975, are entitled to moderate weight."
The trial court found the existence of one aggravating circumstance  that the murder was committed during the course of a robbery.
Dorsey argues that the trial court erred in failing to find as a nonstatutory mitigating circumstance that his codefendant was not sentenced to death. Here, his codefendant, Calvin Middleton, was charged with capital murder and made a deal with the State that, if he testified truthfully at Dorsey's trial, the State would not seek the death penalty in his case. Middleton had been indicted for capital murder. The agreement also provided that the State would not seek reduction of any charges against Middleton. This is not a situation like the one presented to the Alabama Supreme Court in Ex parte Burgess, 811 So.2d 617 (Ala.2000), where Burgess was the only one of six participants who was charged with, and prosecuted for, the murder. Here, we do not know the ultimate sentence that Middleton received. He had not been tried when Dorsey was convicted and sentenced. Also, the testimony showed that Dorsey shot and killed both Scott Williams and Timothy Bryan Crane. The testimony showed that Dorsey had a higher degree of culpability than did Middleton. We do not believe that the trial court erred in not finding his codefendant's sentence to be a nonstatutory mitigating circumstance. As the Alabama Supreme Court stated in Ex parte Ferguson, 814 So.2d 970 (Ala.2001), "`"While Lockett [v. Ohio, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978)] and *532 its progeny require consideration of all evidence submitted as mitigation, whether the evidence is actually found to be mitigating is in the discretion of the sentencing authority."'" Id. at 976, quoting Ex parte Slaton, 680 So.2d 909, 924 (Ala.1996).
The record reflects that Dorsey's sentence was not imposed under the influence of passion, prejudice, or any other arbitrary factor. Section 13A-5-53(b)(1).
Section 13A-5-53(b)(2) provides that we must independently weigh the aggravating circumstance and the mitigating circumstances to determine the propriety of Dorsey's sentence of death. This was a horrible crime in which three people were killed in a rural store in Conecuh County. After an independent weighing, we are convinced that the trial court correctly found that the aggravating circumstance outweighed the mitigating circumstances and that the result of that weighing mandated a sentence of death. Death is the appropriate sentence for Dorsey's conduct.
Section 13A-5-53(b)(3) provides that we must address whether Dorsey's sentence is disproportionate or excessive when compared to other penalties imposed in similar capital cases. Dorsey argues that his sentence is disproportionate to his codefendant's. In McWhorter v. State, 781 So.2d 257 (Ala.Crim.App.1999), aff'd, 781 So.2d 330 (Ala.2000), cert. denied, 532 U.S. 976, 121 S.Ct. 1612, 149 L.Ed.2d 476 (2001), we stated:
"`While the sentences received by codefendants must be considered by the Court in determining the appropriateness of a death sentence, they are not controlling.' Woodall v. State, 730 So.2d 627, 652 (Ala.Cr.App.1997), aff'd in pertinent part, 730 So.2d 652 (Ala.1998) (`although factors to consider, the facts that Woodall's codefendant John Kennon was not convicted of capital murder, and that Freddie Glenn Pope did not receive the death penalty, do not render Woodall's death sentence disproportionate'). See also Hamm v. State, 564 So.2d 453, 464 (Ala.Cr.App.1989), aff'd, 564 So.2d 469 (Ala.1990) (`although appellant's co-defendant, who was initially charged for the capital offense as well, ultimately received a life sentence for a plea to murder, we are of the opinion that the appellant's sentence of death was none the less appropriate in this case.'). See also Arthur v. State, 711 So.2d 1031, 1096 (Ala.Cr.App.1996), aff'd, 711 So.2d 1097 (Ala.1997) (`[T]he fact that two of the appellant's accomplices were not prosecuted does not make his death sentence disproportionate. Similarly, although Judge Wicker, an accomplice, received a life sentence while Arthur received a death sentence, there was no disparity, especially because the appellant was the triggerman and was already serving a life sentence for murdering a family member when he killed the victim.' Id. at 1096-97. (citations omitted)).
"....
"... `The United States Constitution does not require state appellate courts to compare a defendant's death sentence with sentences imposed in similar case [s] to determine if the death sentence was proportionate. "The Constitution permits qualitative differences in meting out punishment and there is no requirement that two persons convicted of the same offense receive identical sentences."' McNair v. State, 706 So.2d 828, 844-45 (Ala.Cr.App.1997) (the appellant's death sentence was not disproportionately severe although his codefendant was convicted only of first-degree robbery and was sentenced to life imprisonment). See also Neelley v. State, 494 So.2d 669, 682 (Ala.Cr.App.1985), aff'd, 494 So.2d 697 (Ala.1986), cert. denied, 480 U.S. 926, 107 S.Ct. 1389, 94 L.Ed.2d 702 (1987) (the appellant's death sentence was not disproportionate *533 despite the fact that her husband/accomplice had not been prosecuted for his participation in the victim's murder)."
781 So.2d at 327-29. Whether Dorsey's sentence is disproportionate does not depend on sentence of his codefendant. Dorsey's sentence is not disproportionate to sentences imposed in similar cases where the aggravating circumstance warranting the death penalty is a robbery. See Reeves v. State, 807 So.2d 18 (Ala.Crim.App.2000); McWhorter v. State, supra; McNair v. State, 706 So.2d 828 (Ala.Crim.App.1997), cert. denied, 523 U.S. 1064, 118 S.Ct. 1396, 140 L.Ed.2d 654 (1998); Stephens v. State, 580 So.2d 11 (Ala.Crim.App.1990), aff'd, 580 So.2d 26 (Ala.1991).
Last, we have searched the entire record for any error that may have adversely affected Dorsey's substantial rights and have found none. Rule 45A, Ala.R.App.P.
Dorsey's conviction and his sentence of death by electrocution are due to be, and are hereby, affirmed.
AFFIRMED.
COBB, BASCHAB, SHAW, and WISE, JJ., concur.
NOTES
[1] Apparently some of the convictions were entered when Jordan was using another name. This appears to be the reason for the discrepancy in the NCIC report.
[2] The trial court also noted that there were no news media in the courtroom at this hearing.
[3] Dorsey argues throughout this issue in brief that Count II of the indictment charged three separate capital offenses  one for each victim. However, this argument is incorrect. Count II charged Dorsey with one capital offense  a violation of § 13A-5-40(a)(10) by murdering two or more people pursuant to one scheme or course of conduct. This is one offense irrespective of the number of victims that are killed. See Borden v. State, 711 So.2d 498 (Ala.Crim.App.1997), aff'd, 711 So.2d 506 (Ala), cert. denied, 525 U.S. 845, 119 S.Ct. 113, 142 L.Ed.2d 91 (1998).

Also, Dorsey was not adjudged guilty of any offense under Count II of the indictment. Only the charge upon which the conviction rests is subject to appellate review. Gagliardi v. State, 695 So.2d 206 (Ala.Crim.App.1996).
[4] Although not argued in brief or at trial, we note that Counts II and III of the indictment cite an incorrect Code section. The two Code sections cited, § 13A-5-40(10) and 13A-5-40(15), should actually be § 13A-5-40(a)(10) and 13A-5-40(a)(15). However, the miscitation of a Code section in an indictment does not void an indictment. Citations of Code sections are treated as mere surplusage. See Ex parte Bush, 431 So.2d 563, 564 (Ala.), cert. denied, 464 U.S. 865, 104 S.Ct. 200, 78 L.Ed.2d 175 (1983).
[5] Rule 9.3(a), Ala.R.Crim.P., authorizes a trial court to exclude potential witnesses from the courtroom during the trial proceedings. This rule is often referred to as "the rule."
[6] Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986).
[7] Dorsey also makes a passing reference in his brief to the fact that the trial court did not allow him to call Eddie Hands and Billy Don Clark. In the record, Dorsey argued that Clark was prepared to testify that Hands had made a statement to him about the murders while the two were in jail together. Dorsey's main contention on appeal centers around the alleged statement that Likely made to Henderson while the two were incarcerated together. There is very little information in the record about Hand and Clark. Dorsey's argument at trial and on appeal centers around Likely and Henderson.
[8] An exhibit attached to one of the motions filed by Dorsey is a copy of a interoffice memorandum prepared by Agent Ron Bankston after talking with Henderson. The memorandum states, "After interviewing Henderson and Likely investigators brought the two subjects together to tell their story in front of each other. Henderson told the same story while Likely denied telling Henderson that he shot anyone or [denied] being at the store on the night of the killings. Likely said, that someone told him what happened at the Carys store but during the interview Likely never told investigators that he was told what happened."
[9] Most of the instances of alleged hearsay were not specifically argued in brief. Dorsey's argument merely lists page numbers and makes a broad assertion that the trial court erred in allowing the testimony on the cited pages to be admitted. While we strongly disapprove of Dorsey's insufficient presentation of this argument in his brief, we will review the selected pages for any reversible error because this is a death-penalty case.
[10] The following occurred during Middleton's direct examination:

"Q [Prosecutor]: All right. And have you made a deal with the State?
"A: Yes, I have.
"Q: Would you tell the jury over here, the best you can, what you understand about that deal?
"A: If I will testify truthfully and cooperate with the investigators that they will not seek the death penalty on me.
"Q: All right. Have your charges been reduced in any way?
"A: No, they haven't.
"Q: Have you been allowed out on bond?
"A: No, I haven't.
"Q: Have you been told that you'll get any specific sentence in connection with this?
"A: No, I haven't.
"Q: All right. Have you been told that if you got in Court here today and testified that the State might change their mind and lower this deal?
"A: No, I haven't."
[11] We note that the record does reflect that immediately after the jury returned their verdict the trial court accepted a verdict of the intentional murder of Crane under Count I of the indictment. This conviction was properly vacated before the sentencing hearing because it is included in the offense charged in Count III of the indictment. The trial court properly vacated this conviction. See Borden v. State, 711 So.2d 498 (Ala.Crim.App.1997), aff'd, 711 So.2d 506 (Ala.), cert. denied, 525 U.S. 845, 119 S.Ct. 113, 142 L.Ed.2d 91 (1998).
[12] The trial court did give a lesser included offense instruction on felony murder under Count II of the indictment  the killing of two or more people during one course of conduct. "We conclude that felony murder is not a lesser included offense made capital because two or more persons were killed pursuant to one course of conduct, the offense charged in the indictment." Apicella v. State, 809 So.2d 841 (Ala.Crim.App.2000). However, the trial court must have realized its error because no verdict was accepted as to Count II of the indictment. Therefore, Dorsey has suffered no prejudice. "`The charge upon which the conviction rests is the only charge that is subject to appellate review.'" Gagliardi v. State, 695 So.2d 206, 208 (Ala.Crim.App.1996), quoting McCain v. State, 611 So.2d 1123, 1124 (Ala.Crim.App.1992). We also apply a harmless-error analysis to the erroneous giving of a jury instruction in the guilt phase of a capital trial. See Jackson v. State, 674 So.2d 1318, 1326 (Ala.Crim.App.1993), aff'd. in relevant part, 674 So.2d 1365 (Ala.1994), on remand, 674 So.2d 1370 (Ala.Crim.App.1995).
[13] Although Judges Shaw and Wise were not members of this Court when this case was orally argued, the video tapes of the argument have been made available to them.